THE FOLLOWING IS THE P.D.F. OF AN OFFICIAL TRANSCRIPT.

OFFICIAL TRANSCRIPTS MAY ONLY BE FILED IN CM/ECF BY THE

OFFICIAL COURT REPORTER AND WILL BE RESTRICTED IN CM/ECF FOR A

PERIOD OF 90 DAYS.  YOU MAY CITE TO A PORTION OF THE ATTACHED

TRANSCRIPT BY THE DOCKET ENTRY NUMBER, REFERENCING PAGE AND

LINE NUMBER, ONLY AFTER THE COURT REPORTER HAS FILED THE

OFFICIAL TRANSCRIPT.  HOWEVER, YOU ARE PROHIBITED FROM

ATTACHING A FULL OR PARTIAL TRANSCRIPT TO ANY DOCUMENT FILED

WITH THE COURT.

UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT

```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF GEORGIA
                          ATLANTA DIVISION



J. CATHELL, INC.,                )
                                 )
                 PLAINTIFF,      )
                                 )
        VS.                      )
                                 )          DOCKET NUMBER
HALEY ELIZABETH MARTIN,          )          1:22-CV-5039-LMM
ET AL.,                          )
                 DEFENDANTS.     )          ATLANTA, GEORGIA
                                 )          JANUARY 18, 2023
                                 )
_____ )
```

```
                   TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE LEIGH MARTIN MAY,
                   UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

FOR THE PLAINTIFF:            TALA AMIRFAZLI
                             BURR & FORMAN, LLP
                             ATLANTA, GEORGIA   30363


FOR THE DEFENDANT:           ANDREW CONNORS & ABIGAIL WHITE
                             DARKHORSE ATTORNEYS
                             LYNCHBURG, VIRGINIA   24502

                             TODD ECHOLS
                             STOCKBRIDGE, GEORGIA   30281



            *MECHANICAL STENOGRAPHY OF PROCEEDINGS*
         *AND COMPUTER-AIDED TRANSCRIPT PRODUCED BY*

OFFICIAL COURT REPORTER:     MONTRELL VANN, RPR, RMR, RDR, CRR
                             2160 UNITED STATES COURTHOUSE
                             75 TED TURNER DRIVE, SOUTHWEST
                             ATLANTA, GEORGIA   30303
                             (404)215-1549


        UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT

1          *(IN ATLANTA, FULTON COUNTY, GEORGIA, JANUARY 18, 2023, IN*

2  *OPEN COURT.)*

3          THE COURT:  OKAY.  GOOD MORNING.  YOU MAY BE SEATED.

4          MR. CONNORS:  GOOD MORNING.

5          THE COURT:  WE ARE HERE IN CIVIL ACTION 22-CV-5339,

6  J. CATHELL, INC., VS. HALEY ELIZABETH MARTIN, ET AL.

7      AND STARTING WITH PLAINTIFF'S COUNSEL, IF COUNSEL WOULD

8  INTRODUCE THEMSELVES, PLEASE.

9          MS. AMIRFAZLI:  GOOD MORNING, YOUR HONOR.  MY NAME IS

10  TALA AMIRFAZLI, AND I'M HERE ON BEHALF OF PLAINTIFF.

11          THE COURT:  OKAY.  GOOD MORNING.

12          MR. CONNORS:  GOOD MORNING, YOUR HONOR.  I'M ANDREW

13  CONNORS, MY CO-COUNSEL ABBY WHITE HARRIS, AND TED ECHOLS OUR

14  LOCAL COUNSEL.  WE'RE HERE ON BEHALF OF THE DEFENDANTS.

15          THE COURT:  OKAY.  GOOD MORNING TO YOU AS WELL.

16          MR. CONNORS:  GOOD MORNING.

17          THE COURT:  I HAVE HAD A CHANCE TO REVIEW ALL THE

18  INFORMATION THAT WAS PROVIDED, AND SO I'M PRETTY FAMILIAR WITH

19  THE INFORMATION IN THE RECORD.  I TYPICALLY DO HAVE QUESTIONS,

20  SO I'LL PROBABLY BE ASKING YOU QUESTIONS AS WE GO THROUGH IT.

21  AND IN TERMS OF THE PLAINTIFFS' ARGUMENT, A LOT OF TIMES AT

22  THESE T.R.O. HEARINGS ATTORNEYS SPEND A LOT OF TIME ON THE

23  SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS, AND THE OTHER

24  FACTORS ARE A LITTLE BIT MORE CLEAR.  I DON'T THINK THAT

25  THEY'RE NECESSARILY AS CLEAR IN THIS CASE, SO I JUST WANT TO

```
1   MAKE SURE THAT THE PLAINTIFF DOES TAKE TIME TO ADDRESS THOSE
2   ISSUES.  SO I DID SET A TIME FOR THE ARGUMENTS.  THE TIMERS ARE
3   ON THE WALL OVER THERE.  AND WHEN THE PLAINTIFF SPEAKS, THE
4   TIMERS WILL START.  AND IF YOU WANT TO SAVE ANY TIME FOR
5   REBUTTAL, IT WILL JUST BE THE TIME THAT'S LEFT ON THE CLOCK.
6   SO, WITH THAT, I'LL GO AHEAD AND HEAR FROM PLAINTIFF'S COUNSEL.
7         MS. AMIRFAZLI:  THANK YOU, YOUR HONOR.  AND I WILL BE
8   SAVING SOME TIME, SO I'LL KEEP A TRACK OF THE TIME I'M USING.
9   AND I HAVE A PRESENTATION TO KIND OF GOING ALONG WITH MY
10  ARGUMENT BECAUSE IT'S VERY VISUAL-HEAVY, AS I'M SURE YOU SAW.
11  BUT -- SO HOPEFULLY IT WILL HELP --
12        THE COURT:  AND I DID HAVE A CHANCE TO LOOK AT ALL
13  THE VISUALS IN THE DOCUMENTS.  IT'S PROBABLY A BETTER USE OF
14  YOUR TIME TO GET TO THE LEGAL ISSUES.
15        MS. AMIRFAZLI:  SURE.
16        THE COURT:  BECAUSE THAT'S ULTIMATELY WHAT'S GOING TO
17  BE MOST IMPORTANT TO ME.
18        MS. AMIRFAZLI:  OKAY.  IF I NEED TO SHOW ANYTHING, I
19  WILL -- IT WILL POP IT UP, BUT -- SO, LIKE I SAID MY NAME IS
20  TALA AMIRFAZLI, AND I'M HERE ON BEHALF OF PLAINTIFF, J.
21  CATHELL, INC.  J. CATHELL, INC., AS I'M SURE YOU ARE AWARE, IS
22  A SOCIAL MEDIA, INFLUENCING, BLOGGING BUSINESS THAT PROVIDES
23  CERTAIN TIPS FOR FASHION, DESIGN, TRAVEL TO ITS CONSUMERS AND
24  ITS FOLLOWERS.  JESSICA CATHELL, WHO IS SITTING BEHIND ME
25  TODAY, STARTED THE J. CATHELL BUSINESS AND BEGAN HER SOCIAL
```

1    MEDIA, INFLUENCING AND BLOGGING BUSINESS WHICH FIRST STARTED A

2    LITTLE BIT DIFFERENT THAN WHAT IT LOOKS LIKE TODAY.  THERE WAS

3    A REBRANDING AROUND EARLY 2021 WHEN HER INITIAL BLOG WAS

4    HACKED.  SO WHAT WE SEE TODAY IS A LITTLE BIT DIFFERENT THAN

5    WHAT SHE HAD INITIALLY STARTED, BUT IT IS WHAT SHE HAS SPENT A

6    LOT OF TIME AND MONEY CREATING AND MAKING SURE IS SUCCESSFUL.

7         SO AT AN EXTREMELY HIGH LEVEL, THE J. CATHELL BUSINESS

8    OPERATES ON VARIOUS PLATFORMS, BOTH INSTAGRAM, FACEBOOK,

9    PINTEREST, THE LIKE TO KNOW ACCOUNT, BUT THE FOCUS TODAY AND IN

10   THE BRIEFING HAS BEEN ON INSTAGRAM AND THE LINKING ABILITIES

11   THAT LIKE TO KNOW PROVIDES FOR THE ULTIMATE PURPOSE OF A BLOG,

12   WHICH IS TO -- ESSENTIALLY MAKE MONEY OFF OF WHAT IS BEING

13   PROMOTED AND THE ITEMS FEATURED IN THE CONTENT.

14         THE COURT:  NOW, I'M A LITTLE -- WHEN I READ THROUGH

15   EVERYTHING, I WANT TO KNOW EXACTLY WHAT THE TRADE SECRETS ARE.

16         MS. AMIRFAZLI:  SURE.

17         THE COURT:  I'M A LITTLE CONFUSED ABOUT THAT BECAUSE

18   THERE'S THIS MEETING THAT HAPPENED WITH LIKE TO KNOW WHERE THEY

19   WERE PROVIDING GUIDANCE TO PLAINTIFF AS TO KIND OF HOW TO

20   OPTIMIZE THE WAY THAT THEY DID THE SITE.  AND THERE'S A LOT OF

21   GENERAL TALK ABOUT TRADE SECRETS AND CONFIDENTIAL INFORMATION,

22   BUT I DON'T KNOW WHAT THAT IS, LIKE, WHAT CATEGORIES.  AND SO

23   IS IT -- CERTAINLY IT'S NOT THE WAY IT LOOKS BECAUSE THAT IS --

24   EVERYONE CAN SEE THAT.  SO TELL ME EXACTLY HOW YOU DEFINE THE

25   TRADE SECRETS.

```
1            MS. AMIRFAZLI:  SURE.  SO ONE -- SO ESSENTIALLY -- SO
2   THE TRADE SECRET IS, LIKE YOU SAID, IT'S NOT SO MUCH FOCUSED ON
3   THE LOOK OF HER PAGE.  I MEAN, ANYONE CAN -- THESE ARE ALL
4   PUBLIC, SO ANYONE CAN GO LOG IN, SEE HOW SHE'S POSTING
5   SOMETHING, SEE HOW OTHERS ARE POSTING SOMETHING AND TRY TO
6   REPLICATE THE VISUAL COMPONENT OF A POST.  SO THAT IS NOT
7   NECESSARILY WHAT WE'RE CLASSIFYING AS THE TRADE SECRET.  WHAT
8   WE'RE CLASSIFYING A THE TRADE SECRET IS EVERYTHING ON THE BACK
9   END THAT US AS THE PUBLIC HAS NO INSIGHT INTO.  SO WHILE I CAN
10  SEE WHAT J. CATHELL IS PROMOTING AND HOW -- WHAT OUTFITS SHE IS
11  CREATING ON WHAT SHE'S PUTTING TOGETHER VISUALLY, I DON'T KNOW,
12  YOU KNOW, WHY SHE IS PICKING CERTAIN THINGS, YOU KNOW, WHEN --
13  WHY SHE IS POSTING CERTAIN THINGS AT CERTAIN TIMES, WHAT THINGS
14  SHE IS COMBINING, WHAT THINGS SHE'S NOT COMBINING, WHAT THINGS
15  SHE IS NOT PROMOTING.  YOU KNOW, THIS HAS BEEN OVER THE COURSE
16  OF HER -- SINCE HER REBRAND SHE HAS BEEN TESTING OUT A LOT OF
17  DIFFERENT -- YOU KNOW, THROUGH TRIAL AND ERROR, DIFFERENT
18  THINGS TO BASICALLY MAKE HER BUSINESS WHAT IT IS TODAY.
19            THE COURT:  OKAY.  WELL, LET'S BREAK THAT DOWN
20  BECAUSE I NEED A REALLY CLEARLY DEFINED TRADE SECRET.  SO
21  OBVIOUSLY IT'S STUFF ON THE BACK END AND THE OUTFIT SHE PICKS.
22  I DON'T KNOW THAT THAT WOULD NECESSARILY BE A TRADE SECRET
23  BECAUSE THAT'S ONE THING YOU MENTIONED, BUT YOU SAID ONE OF
24  THEM IS THE TIMING OF WHEN THINGS ARE POSTED?
25            MS. AMIRFAZLI:  YEAH.
```

UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT

```
1              THE COURT:  OKAY.  AND WHAT ELSE IS THE TRADE SECRET?
2              MS. AMIRFAZLI:  AND THEN ALSO THE -- BASICALLY THE
3    COMBINATION OF EVERYTHING.  SO IT'S NOT JUST THIS ONE SWEATER,
4    YOU KNOW, THE FACT THAT SHE'S POSTING THIS SWEATER ISN'T THE
5    TRADE SECRET.  WE CAN ALL SEE WHAT SHE'S POSTING.  IT'S THE
6    FACT THAT SHE HAS COMBINED A LOT OF DIFFERENT, YOU KNOW,
7    PARTNERSHIPS WITH RETAILERS, HER FORMULAS TO ESSENTIALLY CREATE
8    WHAT SHE IS CREATING.  AND THE -- YOU KNOW, THE SPACING OF
9    EVERYTHING, WHEN SHE'S POSTING CERTAIN THINGS, WHETHER THEY ARE
10   POSTED ON HER STORY, ON HER HOME PAGE, YOU KNOW, THERE'S THE
11   SEQUENCE THAT SHE DOES, THERE'S THIS ESSENTIALLY --
12             THE COURT:  CAN'T EVERYONE SEE THAT?
13             MS. AMIRFAZLI:  YEAH.
14             THE COURT:  LIKE, THE TIMING IS SOMETHING THAT
15   EVERYONE CAN SEE.  THE SECRETS SEEM -- IS SOMETHING THAT ANYONE
16   CAN SEE.  THE COMBINATION SHE'S USING.
17             MS. AMIRFAZLI:  YEAH.  SO THERE'S NO SECRET THAT THIS
18   WORLD, THIS SOCIAL MEDIA WORLD IS VERY LARGE AND BIG AND SO
19   MANY PEOPLE ARE TRYING TO GET INTO IT.  NO ONE'S STOPPING
20   ANYONE FROM GOING ON TO ANYONE'S PAGE AND TRYING TO COPY, OH,
21   OKAY, I THINK SHE'S POSTING ON -- AT THIS TIME, SHE'S, YOU
22   KNOW, POSTING THESE OUTFITS, I'M GOING TO TRY AND REPLICATE IT.
23   BUT WITHOUT THE KNOWLEDGE OF THE BACK-END THINGS, WHICH IS
24   THE --
25             THE COURT:  I DON'T KNOW WHAT IS, AND THAT'S --
```

```
 1              MS. AMIRFAZLI:  SURE.

 2              THE COURT:  BECAUSE EVERYTHING YOU'VE MENTIONED IS

 3    SOMETHING THAT YOU COULD SEE IF YOU WERE JUST LOOKING AT IT.

 4    SO WHAT IS THE BACK-END SECRET PART?

 5              MS. AMIRFAZLI:  YEAH, SO IT'S ESSENTIALLY WHY SHE

 6    POSTS CERTAIN THINGS.  SO IF I WANTED TO GO REPLICATE HER

 7    INSTAGRAM ACCOUNT, I CAN SEE WHAT SHE'S DOING, BUT I DON'T KNOW

 8    WHY SHE'S DOING ANYTHING.  I CAN TRY AND REPLICATE IT, BUT

 9    WITHOUT THE KNOWLEDGE OF THE -- HER FORMULAS AND HER STRATEGIES

10    AND HER PLANS, HER -- YOU KNOW, HER -- AGAIN, THIS BACK-END

11    STUFF.  THERE'S NO WAY FOR ME TO CONTINUE REPLICATING ANYTHING

12    OR TO MAKE ANY SORT OF SUCCESSFUL REPLICA OF HER BUSINESS

13    BECAUSE I WON'T KNOW THIS INFORMATION THAT SHE HAS ON HER

14    END --

15              THE COURT:  WHY IS THAT IMPORTANT?  I GUESS THAT'S

16    WHAT I'M MISSING.  SO LET'S SAY I WANTED TO COPY EVERYTHING

17    SHE'S DOING, SO I JUST WATCHED HER AND EVERY DAY I DID EXACTLY

18    WHAT SHE DID, AND I DIDN'T KNOW WHY, I JUST KNEW THAT I WAS

19    REPLICATING SOMEONE THAT IS SUCCESSFUL.  WHY WOULDN'T I END UP

20    WITH THE SAME RESULT?  I WOULDN'T CARE WHY.  I COULD JUST LOOK

21    AT EVERYTHING SHE WAS DOING AND DO THE SAME THING.  AND THAT'S

22    WHERE I DON'T SEE WHAT THE SECRET IS IN TERMS OF EVERYTHING'S

23    GOING TO BE SHOWN TO THE PUBLIC.  WHY DOESN'T NECESSARILY

24    MATTER.  ANYBODY COULD JUST DO EXACTLY WHAT SHE'S DOING.

25              MS. AMIRFAZLI:  SO ONE THING TO POINT OUT IS THAT
```

```
1   THERE ARE A LOT OF COPYCAT ACCOUNTS OUT THERE THAT MS. CATHELL
2   RUNS ACROSS AND SEES, AND SHE'LL MONITOR THEM.  BUT WITHOUT
3   THIS, LIKE, KNOWLEDGE THAT I'LL EXPLAIN IN A LITTLE BIT, THEY
4   DON'T GO ANYWHERE BECAUSE THE SUCCESS OF A BUSINESS, THIS TYPE
5   OF BUSINESS IS THE AMOUNT OF FOLLOWERS YOU HAVE AND THE
6   ENGAGEMENT THAT YOUR FOLLOWERS HAVE WITH YOUR POSTS AND
7   INTERACTING WITH THE CONTENT AND GOING THROUGH ALL OF THE LINKS
8   AND LINKING TO THE RETAILERS ULTIMATELY BUY THE PRODUCTS.  I
9   CAN REPLICATE THIS ENTIRE MODEL, BUT WHAT I'M JUST VISUALLY
10  SEEING WITH THE POST.  BUT WITHOUT, YOU KNOW, CAPTURING MY
11  FOLLOWERS AND THE TYPES OF FOLLOWERS THAT MS. CATHELL HAS
12  CAPTURE, MY ACCOUNT WOULDN'T GO ANYWHERE.  IT WOULD MAYBE LOOK
13  THE SAME.  IT WOULD LOOK LIKE THIS, BUT I WOULDN'T HAVE THE
14  FOLLOWERS, I WOULDN'T BE GENERATING THE INCOME, THE REVENUE,
15  THE COMMISSIONS, ANYTHING LIKE THAT.  SO ONE OTHER KIND OF --
16  IN PART PUBLIC, BUT BASED IN NON-PUBLIC INFORMATION IS THE WAY
17  MS. CATHELL ADVERTISES HER POSTS AND PROMOTES HER POSTS.  SO,
18  YOU KNOW, AS A INSTAGRAM USER, I CAN SEE IF CERTAIN -- SHE'S
19  RUNNING A CERTAIN AD, FOR EXAMPLE, LIKE, SOMETHING POP UP WHERE
20  I SEE THAT SHE'S SEEMINGLY PROMOTING A CERTAIN POST OR CONTENT
21  IN THE POST.  BUT I DON'T KNOW AND I HAVE NO WAY OF KNOWING
22  WHAT SHE IS DOING BEFORE -- OR PUBLISHING THAT ADVERTISEMENT,
23  LIKE, THE CERTAIN, YOU KNOW, THINGS SHE'S CHECKING TO MAKE SURE
24  THAT THIS AD GOES TO THIS, YOU KNOW, GROUPING OF PEOPLE, WE'RE
25  GOING TO TARGET THE AD TO THIS.  IT'S ESSENTIALLY THIS
```

1  MARKETING PLAN STRATEGY THAT LEADS TO HER DOING CERTAIN THINGS

2  THAT CREATE THIS PUBLIC POST, WHICH IS WHAT WE ULTIMATELY SEE.

3  SO WITHOUT THE KNOWLEDGE OF THAT, WITHOUT USING WHAT SHE IS

4  DOING, THERE'S REALLY NO EFFECTIVE WAY OF REPLICATING IT.  I

5  CAN REPLICATE THE LOOK OF HER INSTAGRAM, BUT I WON'T BE ABLE TO

6  REPLICATE HER SUCCESS.  NOW OF COURSE BY NO MEANS ARE WE

7  SUGGESTING THAT J. CATHELL IS AND SHOULD BE THE ONLY SOCIAL

8  MEDIA, INFLUENCING, BLOGGING BUSINESS THAT IS PROFITABLE.

9  THERE'S VERY MANY -- THERE'S MANY PROFITABLE BLOGS.  THERE'S

10 ALSO MANY THAT FAIL BECAUSE THEY CAN'T GRASP THE PUBLIC OR THE

11 AUDIENCE THAT THEY'RE TRYING TO CAPTURE.  AND IN FACT BEFORE

12 MS. CATHELL REBRANDED HER BUSINESS, SHE WAS RUNNING INTO THOSE

13 SORTS OF PROBLEMS THAT ALL STARTING BLOGGERS WILL FACE, WHICH

14 IS --

15       THE COURT:  HOW DO YOU KNOW THAT THE DEFENDANT IS

16 ACTUALLY USING THE TRADE SECRETS?  I DIDN'T SEE -- IT SOUNDS

17 LIKE WHAT YOU'RE SAYING IS THAT YOU CAN LOOK AT IT AND SEE THAT

18 SHE'S USING THE TRADE SECRETS BECAUSE IT LOOKS THE SAME, BUT

19 YET IT'S A SECRET, SO YOU CAN'T NECESSARILY KNOW THAT THERE ARE

20 TRADE SECRETS.  AND SO THAT SEEMS TO BE VERY CIRCULAR, THAT

21 THIS IDEA THAT WE KNOW SHE'S USING THE TRADE SECRETS BECAUSE IT

22 LOOKS THE SAME, BUT YET THAT'S NOT ENOUGH.

23       MS. AMIRFAZLI:  SO THERE'S A REASON MS. CATHELL HAS

24 NEVER FILED A LAWSUIT AGAINST ANY OTHER SEEMINGLY COPYCAT

25 INSTAGRAM ACCOUNT THAT SHE FINDS, THOUGH SHE COMES ACROSS THEM

1  ALL THE TIME.  BUT THE DIFFERENCE HERE IS THAT MS. MARTIN

2  WORKED WITH -- WORKED AT J. CATHELL WHEN THE REBRAND WAS

3  HAPPENING AND WHEN MS. CATHELL WAS TESTING ALL OF HER IDEAS AND

4  HER STRATEGIES AND GOING THROUGH THIS TRIAL AND ERROR PROCESS

5  TO BASICALLY COME UP WITH HER NOW MARKETING BUSINESS PLAN.

6         THE COURT:  AND I SEE THAT SHE HAS ACCESSES TO THEM.

7  CERTAINLY I SEE THAT IN YOUR THING, BUT USUALLY WHEN I HAVE A

8  T.R.O. HEARING, THERE'S SOME EVIDENCE THAT SPECIFICALLY SHOWS

9  THAT THEY KNOW THAT THEY ARE USING THE TRADE SECRET, NOT JUST

10  ACCESS.  SO HOW DO WE KNOW THAT THE SECRET INFORMATION IS

11  ACTUALLY BEING UTILIZED AND SHE'S NOT JUST DOING A COPYCAT

12  WEBSITE WITHOUT DISCOVERY?  BECAUSE I THINK DISCOVERY MIGHT

13  SHOW EXACTLY HOW SHE'S RUNNING THIS, BUT I DON'T THINK YOU

14  HAVE -- YOU'RE SAYING THAT ALL THIS STUFF ON THE BACK END THAT

15  YOU CAN'T SEE MAKES IT A TRADE SECRET.  SO WITHOUT ACCESS TO

16  THE BACK-END INFORMATION, YOU KNOW SHE HAS ACCESS, BUT HOW DO

17  YOU HAVE PROOF THAT SHE'S USING IT?

18         MS. AMIRFAZLI:  SO WHEN MS. CATHELL HIRED MS. MARTIN,

19  SHE WAS HIRED AS HER ASSISTANT TO BASICALLY -- I MEAN,

20  BASICALLY IT WAS MS. CATHELL AND MS. MARTIN, RIGHT, SO

21  MS. CATHELL WAS LEADING THE DRIVE OF WHAT SHE WANTED TO SEE IN

22  HER INSTAGRAM ACCOUNT, WHAT TYPE OF CONTENT SHE WANTED TO

23  RELEASE, WHAT SHE WANTED TO PROMOTE.  SHE WAS DRIVING ALL OF

24  THIS STUFF, BUT IT WAS ALSO THEY WERE WORKING EVERY DAY

25  TOGETHER, SPEAKING ALL DAY MOST DAYS, YOU KNOW, DURING THE

1  BUSINESS HOURS AND THE BUSINESS DAYS.  THEY WERE WORKING VERY

2  CLOSELY TOGETHER TO MAKE SURE THAT MS. MARTIN -- YOU KNOW, SHE

3  WAS RESPONSIBLE PRIMARILY FOR THE FIRST DRAFTS OF EVERYTHING.

4  SO WITHOUT, YOU KNOW -- J. CATHELL WOULD SPEAK ABOUT WHAT SHE

5  WANTED TO DO, THESE PLANS AND THESE STRATEGIES AND THESE

6  ADVERTISING GOALS THAT SHE WANTED TO ACCOMPLISH AND SHE WOULD

7  TELL MS. MARTIN HOW THEY WERE GOING TO BE ACCOMPLISHED WITH ALL

8  OF THE -- WHAT MS. CATHELL HAD OVER THE YEARS LEARNED AND

9  ACQUIRED THROUGH RUNNING HER BUSINESS.  AND MS. MARTIN

10 IMPLEMENTED THOSE IN THE FIRST DRAFTS OF EVERYTHING, WHETHER,

11 LIKE, THE VISUALS OF WHAT WE SEE, THE CONTENT, OR IF IT WAS THE

12 SOMETHING LIKE THE -- LIKE AN ADVERTISING.  SO IF SHE WAS GOING

13 TO BE UNLOADING SOMETHING INTO ADVERTISING, MS. CATHELL WOULD

14 TELL HER, OKAY, WE NEED TO, YOU KNOW, DO THIS, THIS AND THIS,

15 CHECK THESE BOXES TO MAKE SURE THAT IT GOES TO WHERE I WANT IT

16 TO GO, IT'S PROMOTING THE THING THAT I WANT IT TO PROMOTE.  AND

17 SO MS. CATHELL WAS BASICALLY ON A DAILY BASIS TELLING

18 MS. MARTIN WHAT TO DO.

19         THE COURT:  BUT ISN'T THERE A QUESTION OF FACT ON

20 THAT?  BECAUSE WHEN I READ THE TWO AFFIDAVITS, THEY SEEM TO

21 PRESENT A VERY DIFFERENT STORY ABOUT HOW THIS ALL WORKED.  AND

22 ULTIMATELY SOMEBODY'S RIGHT AND SOMEBODY'S WRONG.

23         MS. AMIRFAZLI:  OF COURSE.

24         THE COURT:  BUT IT APPEARS THAT THERE'S A QUESTION OF

25 FACT ON WHO WAS REALLY LEADING THIS TRAIN, SO TO SPEAK, WHO HAD

```
 1    THE EXPERIENCE.
 2            MS. AMIRFAZLI:  SO IN OUR REPLY -- SO OF COURSE THE
 3    DECLARATIONS ARE COMPETING.  I REALIZED THAT.  AND THE
 4    STATEMENTS OF KIND OF EVERYONE'S ROLE AND EXPERIENCE PRIOR TO
 5    IS STATED DIFFERENTLY, BUT WHEN MS. CATHELL HIRED MS. MARTIN,
 6    WE PROVIDED A SCREENSHOT OF AN E-MAIL WHEN MS. MARTIN WAS
 7    APPLYING ESSENTIALLY FOR THIS POSITION OR INQUIRING FOR THE
 8    POSITION.  MS. CATHELL'S UNDERSTANDING WAS THAT MS. MARTIN
 9    DIDN'T HAVE ANY EXPERIENCE WORKING WITH ANY OTHER SOCIAL MEDIA
10    BLOGGER OR INFLUENCER.  SO SHE HAD SOME EXPERIENCE WITH A
11    JEWELRY LINE THAT SHE HAD STARTED AND WORKING WITH HER FAMILY'S
12    FOUNDATION, BUT SHE HAD NO OTHER EXPERIENCE THAT WOULD
13    OTHERWISE BE NECESSARY FOR DRIVING THE J. CATHELL BUSINESS.
14    BUT OF COURSE BECAUSE OF HER OTHER EXPERIENCE THAT SHE HAD WITH
15    CERTAIN PROGRAMS AND HER WILLINGNESS TO WANT TO WORK AND HER
16    EXCITEMENT TO WORKING, MS. CATHELL ESSENTIALLY MOLDED
17    MS. MARTIN INTO DEVELOPING THE STYLE THAT MS. CATHELL WANTED TO
18    PROMOTE.  SO THAT'S SHOWN IN SOME OF THE E-MAILS WHERE
19    MS. CATHELL WOULD REVIEW ALL OF THE DRAFTS AND MAKE CERTAIN
20    CHANGES AND TWEAKS AND REALLY TO MAKE SURE THAT IT WASN'T
21    HALEY'S VISION THAT WAS BEING PROMOTED THROUGH THE BLOG.  IT
22    WAS ACTUALLY MS. CATHELL, BUT, YOU KNOW, WITH THE WORK DONE BY
23    MS. MARTIN.  AND THERE ARE SOME COMPETING STATEMENTS ABOUT THE
24    AMOUNT OF TIME THEY SPENT TOGETHER OR SPOKE ON THE PHONE OR HAD
25    MEETINGS, BUT, YOU KNOW, ASIDE FROM WHAT IS SAID, THE EVIDENCE
```

```
 1    THAT WE SUBMIT WITH OUR SUPPLEMENTAL DECLARATION SHOWS THAT IT
 2    WAS MUCH MORE THAN WHAT MS. MARTIN IS TRYING TO PORTRAY.  THEY
 3    SPOKE FOR MORE THAN JUST MINUTES A DAY.  YOU KNOW, THEY HAD
 4    REGULAR MORNING MEETINGS.  THEY SPOKE ABOUT THE PLAN FOR THE
 5    DAY, THE GOALS FOR THAT WEEK, THE PLANS FOR THAT WEEK.  THEY --
 6    YOU KNOW, I PROVIDED A EXEMPLARY CALL LOG WHERE IN THE COURSE
 7    OF 21 BUSINESS DAYS THEY SPOKE 20 BUSINESS DAYS ON THE PHONE
 8    FOR AN AVERAGE OF ABOUT 47 MINUTES PER DAY.  SO THAT'S
 9    SIGNIFICANTLY MORE THAN A FEW MINUTES HERE AND THERE.  NOW,
10    THAT DOESN'T ALSO CAPTURE THE EXTENSIVE TEXT MESSAGE
11    COMMUNICATIONS DAILY AND CONSTANTLY BETWEEN THE TWO.  THESE TWO
12    WERE WORKING VERY CLOSELY TOGETHER WITH MS. MARTIN MAKING SURE
13    THAT WHAT SHE WANTED WAS BEING ACTUALLY IMPLEMENTED AND DONE.
14    SO THERE'S NO DOUBT IN OUR MIND THAT WHAT MS. MARTIN LEARNED
15    THROUGH WORKING WITH J. CATHELL, SHE HAS USED TO CREATE HER
16    ACCOUNT.
17         NOW, IN GEORGIA, OF COURSE, THERE'S NO -- THERE'S NOTHING
18    PREVENTING ANYONE STARTING A COMPETING BUSINESS.  WHAT WE DO
19    KNOW HERE IS THAT THE WEAR TO WANDER ACCOUNT WAS STARTED AS
20    EARLY OR AS LATE AS -- I BELIEVE IT WAS FEBRUARY OF 2022, AND
21    THAT WAS STILL WHEN SHE WAS WORKING FOR MS. CATHELL.  SO HER
22    EMPLOYMENT WITH J. CATHELL DIDN'T TERMINATE UNTIL SEPTEMBER OF
23    '22, AND THAT WAS AFTER MS. CATHELL LOGGED ONTO THE GEORGIA
24    SECRETARY OF STATE WEBSITE NOTICING THAT THE WEAR TO WANDER
25    ACCOUNT WAS ACTUALLY BEING RUN BY MS. MARTIN.
```

14

```
 1        NOW, ONE OF THE THINGS THAT I THINK IS HELPFUL TO SHED

 2   LIGHT ON THIS IS, LIKE I MENTIONED, THERE'S A LOT OF COPYCAT

 3   ACCOUNTS OUT THERE THAT MS. CATHELL WOULD COME ACROSS OR

 4   MS. CATHELL WOULD COME ACROSS WHILE WORKING FOR J. CATHELL.

 5   THAT'S NOT THE CONCERN.  MS. CATHELL KNEW THAT THESE

 6   COMPETITORS DIDN'T HAVE HER INFORMATION.  THEY HAD IN NO WAY OF

 7   ACCESSING THAT INFORMATION.  THEY HAD NEVER WORKED WITH

 8   MS. CATHELL OR FOR J. CATHELL, SO THEY -- YOU KNOW, WHATEVER

 9   THEY WERE DOING, WHILE IT MIGHT VISUALLY LOOK THE SAME, WAS

10   GOING TO BE DIFFERENT THAN WHAT MS. CATHELL WAS DOING.

11        THE COURT:  WELL, I THINK THAT'S WHAT'S GIVING YOU A

12   PROBLEM BECAUSE YOU CAN HAVE A COPYCAT ACCOUNT THAT LOOKS

13   SIMILAR AND DOING SIMILAR THINGS AND NOT USING TRADE SECRETS.

14   AND EVERYTHING THAT -- EVEN ACCEPTING YOUR VERSION AS TRUE, IS

15   THAT SHE WAS TRAINING AND LEARNING AND USING THIS LIKE TO KNOW

16   PLATFORM.  AND SO YOU'RE SAYING KIND OF THAT SHE HAD TO HAVE

17   USED THE TRADE SECRET IS BECAUSE SHE DIDN'T HAVE THIS

18   INFORMATION WHEN SHE STARTED WORKING HERE, BUT THERE SEEMS TO

19   ME AN ALTERNATIVE VERSION OF IT WHICH COULD BE THAT SHE -- EVEN

20   IF YOU ACCEPT KIND OF WHAT YOU SAY IS TRUE, THAT SHE LEARNED

21   HOW TO DO THIS WHEN SHE WAS WORKING THERE, AND THAT IT'S NOT

22   NECESSARY FOR HER TO USE THE CONFIDENTIAL SECRET STUFF, WHICH

23   I'M STILL NOT QUITE SURE WHAT THAT IS, BUT THAT SHE DIDN'T

24   NECESSARILY HAVE TO USE THAT TO HAVE A COPYCAT.  AND SO IT'S

25   YOUR BURDEN TO PROVE THAT HER SITE ACTUALLY USES THE
```

```
 1   CONFIDENTIAL INFORMATION AND DOESN'T ACTUALLY JUST UTILIZED

 2   WHAT SHE LEARNED THAT IS, LIKE, KNOWLEDGE IN THE INDUSTRY.

 3           MS. AMIRFAZLI:  SO ONE STORY THAT MIGHT KIND OF HELP

 4   CLARIFY THIS IS MS. CATHELL IS APPROACHED PRETTY REGULARLY BY

 5   VARIOUS FOLKS IN THE INDUSTRY, WHETHER IT BE ON THE LIKE TO

 6   KNOW SIDE OR OTHER BLOGGERS, WHERE THEY'RE ASKING -- THEY'RE

 7   ESSENTIALLY -- EVERYONE'S SURPRISED BY HOW SUCCESSFUL HER

 8   BUSINESS IS GIVEN THE AMOUNT OF TIME IT'S EXISTED, THE

 9   NUMBER -- YOU KNOW, THE PROPORTION OF HER KIND OF PROFITS TO

10   HER, THE NUMBER OF FOLLOWERS BECAUSE YOU CAN HAVE --

11           THE COURT:  HOW DO PEOPLE KNOW WHAT HER PROFITS ARE?

12           MS. AMIRFAZLI:  WELL --

13           THE COURT:  BECAUSE I THOUGHT THAT WAS SOMETHING THAT

14   WAS SECRET.

15           MS. AMIRFAZLI:  SO YOU'RE RIGHT, IT IS.

16           THE COURT:  OKAY.

17           MS. AMIRFAZLI:  NOW, MS. MARTIN KNEW BECAUSE SHE WAS

18   WORKING FOR HER.

19           THE COURT:  RIGHT.  BUT I JUST -- ALL THESE PEOPLE

20   THAT KNEW HER PROFITS.

21           MS. AMIRFAZLI:  SO ON THE LIKE TO KNOW SIDE, WHICH

22   THEY ARE RESPONSIBLE FOR THE LINKING TO THE RETAILERS, THEY

23   HAVE SOME INSIGHT TO WHAT BLOGS ARE DOING WELL, LIKE, WHAT

24   THEY'RE GENERALLY GENERATING AND BEING ABLE TO COMPARE THE

25   DOLLAR AMOUNTS THAT THEY'RE GENERATING TO THE NUMBER OF
```

1   FOLLOWERS THEY HAVE.  YOU KNOW, WE TALK ABOUT FOLLOWERS AS THE

2   KIND OF BENCHMARK OF A SUCCESS OF A COMPANY -- OR THIS TYPE OF

3   A COMPANY, BUT IT IS, BUT IT'S -- BUT IT ALSO ISN'T.  SO YOU

4   CAN HAVE THOUSANDS AND THOUSANDS OF FOLLOWERS THAT ARE

5   ESSENTIALLY ON (VERBATIM) ACTIVE INSTAGRAM USERS OR LIKE, BOSS,

6   THEY'RE NOT GOING TO BE BUYING ANYTHING.  SO IT DOESN'T MATTER

7   IF YOU HAVE TWO MILLION FOLLOWERS IF YOUR TWO MILLION FOLLOWERS

8   AREN'T CLICKING THROUGH ANYTHING.  YOU CAN HAVE A THOUSAND

9   FOLLOWERS, AND IF YOUR THOUSAND FOLLOWERS --

10         THE COURT:  LET'S MOVE TO IRREPARABLE INJURY.  SO I

11  HAVE SOME CONCERNS ABOUT THAT FACTOR.  IT'S BRIEFED JUST AS

12  THERE'S GOING TO BE IRREPARABLE INJURY BECAUSE THERE IS

13  CONFIDENTIAL INFORMATION USED, BUT THAT SEEMS A LITTLE

14  CONCLUSORY TO ME IN TERMS OF MY UNDERSTANDING ABOUT HOW THIS

15  KIND OF WORLD WORKS.  AND SO YOU'VE GOT THE COPYCATS AND THEN

16  YOU HAVE THIS ACCOUNT, AND CERTAINLY PEOPLE SUBSCRIBE TO ONE OR

17  MORE OF THESE.  PEOPLE AREN'T JUST GOING TO NECESSARILY PICK

18  ONE.  THEY HAVE A LOT OF THEM, SO HOW DO WE KNOW THAT THERE IS

19  THIS IRREPARABLE INJURY IN TERMS OF THIS LOSS OF FOLLOWERS AND

20  ALSO THAT IT'S NOT SOMETHING THAT CAN BE REPAIRED BY MONEY?

21  BECAUSE IF IT'S REPAIRED BY MONEY, THEN IT'S NOT IRREPARABLE.

22         MS. AMIRFAZLI:  SO THE AMOUNT OF FOLLOWERS IS

23  IMPORTANT, OF COURSE.  THIS TYPE OF BUSINESS WANTS TO RETAIN

24  ITS FOLLOWERS AND GROW ITS FOLLOWERS LIST, BUT THE DAMAGE COMES

25  FROM WHAT THOSE FOLLOWERS ARE DOING AND WHAT THEY'RE BASICALLY

1    CLICKING THROUGH.  SO WHILE ONE PERSON CAN FOLLOW MULTIPLE

2    ACCOUNTS, IF ONE PERSON WANTS TO PURCHASE ONE SPECIFIC ITEM,

3    YOU CAN ONLY PURCHASE THE ITEM THROUGH ONE LINK.  SO YOU'RE

4    EITHER GOING TO BE LINKING THROUGH THE J. CATHELL INSTAGRAM AND

5    LIKE TO KNOW PAGES, OR YOU'RE GOING TO BE LINKING THROUGH

6    SOMEWHERE ELSE.  SO WITH THESE COMPETING, YOU KNOW, VISUALLY

7    SIMILAR INSTAGRAMS COMBINED WITH, YOU KNOW, WHAT MS. MARTIN HAS

8    DONE ON THE BACK END TO BASICALLY GET THE -- GET WEAR TO WANDER

9    TO, YOU KNOW, IN THE SAME KIND OF PATH AS J. CATHELL, THAT'S

10   WHERE IT'S LEADING TO DAMAGE TO MY CLIENT.  YOU KNOW, SHE'S --

11   THERE IS OF COURSE OTHER BLOGS OUT THERE THAT ALL KIND OF

12   OVERLAP IN THE SAME INDUSTRY AND SAME -- SIMILAR TARGET

13   AUDIENCES OR WHAT THEY'RE PROMOTING, BUT THE DIFFERENCE BETWEEN

14   THE OTHER COMPETITORS AND MS. MARTIN'S COMPANY IS THAT THE

15   OTHER COMPETITORS DIDN'T WORK WITH MS. CATHELL.  AND I THINK --

16           THE COURT:  BUT WHY WOULDN'T MONEY SOLVE THIS?  I

17   COULD SEE A SCENARIO WHERE EVERYTHING YOU SAID IS RIGHT AND YOU

18   WIN AT TRIAL AND YOU GET EVERY DOLLAR THAT DEFENDANT HAS MADE

19   THROUGH THE SITE THAT GOES TO YOUR CLIENT.  WHY WOULD THAT NOT

20   FIX THE PROBLEM BECAUSE THERE'S NO EVIDENCE SHE'S SHARING THIS

21   CONFIDENTIAL INFORMATION TO ANYONE ELSE?  TYPICALLY WHEN I HAVE

22   A TRADE SECRETS ISSUE, THE IRREPARABLE INJURY IS THAT SOMEBODY

23   ELSE IS GETTING SOMEBODY -- SOMEBODY NEW IS GETTING ACCESS TO

24   THE CONFIDENTIAL INFORMATION.  AND SO IT SEEMS LIKE IF YOU JUST

25   GAVE THE MONEY BACK, THAT THAT WOULD SOLVE THE PROBLEM.

```
 1              MS. AMIRFAZLI:  SO I THINK IF THE AMOUNT OF THE MONEY
 2    WAS EASY TO IDENTIFY, THAT MIGHT BE, YOU KNOW, THE EASIER THING
 3    TO DO.  BUT HERE THERE'S REALLY NO WAY FOR US TO KNOW WHAT
 4    BASICALLY CLICKS AND FOLLOWERS SHE HAS LOST BECAUSE OF THIS.
 5    SO THERE'S REALLY NO WAY FOR US TO CALCULATE, OH, IF THIS
 6    ACCOUNT, YOU KNOW, DIDN'T USE THOSE SAME FORMULAS AND TOOLS
 7    THAT MS. CATHELL IS USING, THAT, YOU KNOW, THIS GROUP OF PEOPLE
 8    OR THESE CERTAIN ITEMS WOULD HAVE BEEN SOLD.  SO ALL WE KNOW
 9    RIGHT NOW IS THAT, YOU KNOW, SHE LEFT HER EMPLOYMENT, SHE
10    STARTED HER COMPANY WHILE SHE WAS EMPLOYED WITH MS. CATHELL AND
11    ESSENTIALLY CREATED THIS COMPETING BUSINESS THAT BECAUSE OF
12    HER -- OUR UNDERSTANDING WAS THAT SHE DIDN'T HAVE ANY OTHER
13    EXPERIENCE IN THIS TYPE OF INDUSTRY, IN THIS WORLD, IN THIS
14    SPECIFIC TYPE OF BLOGGING AND INFLUENCING INDUSTRY BEFORE
15    WORKING WITH MS. CATHELL.  SO MS. CATHELL ESSENTIALLY MOLDED
16    HER TO WHAT SHE IS TODAY.  AND MS. MARTIN DURING HER EMPLOYMENT
17    WITH MS. CATHELL WAS ESSENTIALLY CREATING HER CONTENT
18    SIMULTANEOUSLY WITH CREATING THE DRAFTS OF THE CONTENT FOR J.
19    CATHELL USING THE SAME KIND OF TOOLS AND THINGS THAT
20    MS. CATHELL WAS IMPLEMENTING.
21         ONE EXAMPLE OF THAT IS, UNLIKE SOME COPYCAT ACCOUNTS, YOU
22    KNOW VISUALLY, AGAIN, THEY'RE ALL OUT THERE, BUT MS. CATHELL ON
23    A DAILY AND WEEKLY BASIS HAS CERTAIN IDEAS THAT SHE WANTS TO
24    TEST OR SHE -- LET'S DO THIS INSTEAD OF THIS, THIS WEEK, YOU
25    KNOW.  AGAIN, THIS HAS BEEN PART OF HER TRIAL AND ERROR PROCESS
```

```
 1   AND BASICALLY FINALIZING, LIKE, HOW HER BUSINESS IS RUN TODAY.

 2   AND CERTAIN THINGS THAT THEY WERE IMPLEMENTING, MS. CATHELL

 3   WOULD LOOK AT THE WEAR TO WANDER ACCOUNT -- NOW THIS IS BEFORE

 4   SHE KNEW MS. MARTIN WAS RUNNING IT, AND THEY WERE IMPLEMENTING

 5   THE SAME THINGS.  SO IT WAS ALL VERY UNLIKE OTHER COPYCAT

 6   ACCOUNTS.  OTHER COPYCAT ACCOUNTS CAN'T KNOW YOUR -- YOU KNOW,

 7   CERTAIN STRATEGIES YOU'RE TRYING TO IMPLEMENT.  THEY WILL KNOW

 8   THE VISUAL OF WHAT IS THE RESULT OF THAT, BUT THEY WON'T KNOW

 9   THE BACK END OF EVERYTHING BECAUSE THERE'S NO WAY TO VIEW THAT.

10       ONE OTHER THING I WANTED TO POINT OUT THAT MS. MARTIN SAYS

11   IN HER DECLARATION WHERE WE EXPLAIN THAT IN OUR SUPPLEMENTAL

12   DECLARATION, IS I DON'T WANT THERE TO BE A MISUNDERSTANDING OF

13   HOW MS. CATHELL DEVELOPED HER BRAND.  SO IT WAS NOT THROUGH THE

14   CONVERSATIONS WITH LIKE TO KNOW REPRESENTATIVES.  THEY DID HAVE

15   CALLS WITH THOSE REPRESENTATIVES, AND THERE'S A CALL REFERENCE

16   IN MS. MARTIN'S DECLARATION WHERE THEY'RE DISCUSSING SORT OF

17   THE LOOK OF THE LAYERING OF THE OUTFITS.  NOW, THE ISSUE IN

18   THAT CALL WAS ACTUALLY THE CALL WAS (VERBATIM) INITIATED BY

19   MS. CATHELL BECAUSE THERE WAS A TECHNICAL GLITCH WITH CERTAIN

20   CONTENT BEING ATTRIBUTED TO MS. CATHELL THAT OTHER BLOGGERS

21   MIGHT ALSO BE FEATURING IN THEIR CONTENT.  SO, FOR EXAMPLE, SHE

22   WOULD GET NOTIFIED IF SOMEONE, YOU KNOW, CLICKED THROUGH, LIKE,

23   A PAIR OF SUNGLASSES ON ANOTHER ACCOUNT THAT LOOKED SIMILAR TO

24   WHAT MS. CATHELL HAD ON HER POST, AND THEN MS. CATHELL WOULD

25   GET NOTIFIED OF THAT ACTIVITY.  SO SHE RAISED THAT WITH LIKE TO
```

```
 1    KNOW, AND THEY ADDRESSED THAT TECHNICAL GLITCH.  IT WAS NOT A
 2    CALL TO DISCUSS HOW SHE DEVELOPED HER BUSINESS OR SOME, YOU
 3    KNOW, IDEAS FOR HER TO IMPLEMENT.  MS. CATHELL HAS BEEN
 4    IMPLEMENTING HER LOOK AND PLAN ALL SINCE HER REBRAND.
 5        THE OTHER KIND OF IMPORTANT THING TO NOTE HERE IS THAT
 6    MS. MARTIN KNEW -- YOU KNOW, DURING THE COURSE OF HER
 7    EMPLOYMENT THERE WERE MANY PEOPLE, LIKE I SAID, THAT WOULD
 8    APPROACH MS. CATHELL TO ASK KIND OF WHAT HER SECRETS ARE, LIKE,
 9    YOU KNOW, YOU'RE GAINING CERTAIN AMOUNT OF FOLLOWERS, YOU KNOW,
10    DAY AFTER DAY OR WEEK AFTER WEEK.  AND, YOU KNOW, AGAIN, ON THE
11    LIKE TO KNOW SIDE THEY WERE SEEING HOW SUCCESSFUL SHE WAS.  AND
12    IT WAS, FROM WHAT THEY WERE TELLING HER, UNLIKE ANYTHING LIKE
13    THAT THEY HAD EVER SEEN BEFORE AT THE RATE AND THE PROPORTION
14    TO THE NUMBER OF FOLLOWERS.  THEY OF COURSE ASKED WHAT HER
15    SECRETS WERE, AND MS. MARTIN AND MS. CATHELL DISCUSSED
16    REGULARLY THAT THEY'RE NOT GOING TO SHARE THIS INFORMATION.  SO
17    I CAN APPRECIATE THE DIFFICULTY KIND OF US ON THE PUBLIC SIDE
18    HAVE TO FULLY GRASP WHAT IS ON THE BACK END OF WHAT WE'RE
19    SEEING, LIKE, A PUBLIC POST THAT WE'RE SEEING.  BUT THE FACT OF
20    THE MATTER IS MS. MARTIN KNEW WHAT THIS WAS.  THEY WERE WORKING
21    CLOSELY TOGETHER AND THEY WERE SPEAKING DAILY ABOUT HOW THIS
22    INFORMATION IS CONFIDENTIAL AND SHOULDN'T BE SHARED WITH
23    OTHERS.  AND YOU'RE RIGHT IN THAT THE -- IN THESE TRADE SECRET
24    CASES A LOT OF THE INFORMATION IS TAKEN FROM ONE PERSON AND
25    SHARED TO OTHERS.  NOW, IF MS. MARTIN JUST LEFT MS. CATHELL'S
```

1    EMPLOYMENT AND, YOU KNOW, STARTED SOME OTHER BUSINESS, THAT

2    WOULDN'T BE THE CONCERN HERE.  SHE TOOK THAT INFORMATION, AND

3    WHILE IT'S ESSENTIALLY ONE IN THE SAME BECAUSE IT'S HER

4    COMPANY, THAT'S WHAT SHE HAS SHARED HER INFORMATION WITH THE

5    WEAR TO WANDER BUSINESS AND ACCOUNT.  SHE KNEW, YOU KNOW, WHAT

6    SHE WAS DOING WAS -- SHE SHOULD NOT BE DOING BECAUSE THERE'S

7    LOTS OF DISCUSSIONS WITH MS. CATHELL AND MS. MARTIN ABOUT THESE

8    OTHER COPYCAT ACCOUNTS AND THE, YOU KNOW, THE FACT THAT WE

9    CAN'T BELIEVE THEY'RE COPYING US, I CAN'T -- YOU KNOW, I CAN'T

10   BELIEVE IT.  BUT THE DIFFERENCE THERE IS THAT THOSE COPYCAT

11   ACCOUNTS NEVER WORKED WITH J. CATHELL AND HAD NO WAY OF KNOWING

12   WHAT J. CATHELL WAS DOING OR NOT DOING ON THE BACK END OF

13   THINGS.

14       AND SO THE OTHER -- YOU KNOW, WE HAVE -- IN FILING THIS

15   MOTION WE RECOGNIZE THAT THERE IS THIS DIFFICULT NATURE OF THE

16   COMBINATION OF THE PUBLIC AND NON-PUBLIC INFORMATION.  THAT

17   DOESN'T NECESSARILY MEAN THAT THE NON-PUBLIC INFORMATION WITH

18   ITS PUBLIC COMPONENTS CAN'T QUALIFY AS A TRADE SECRET, WHICH IS

19   WHY WE'VE NARROWLY TAILORED OUR REQUEST IN THE T.R.O. MOTION TO

20   JUST PROTECT MS. CATHELL'S CONFIDENTIAL INFORMATION.  YOU KNOW,

21   THE DEFENDANTS IN THEIR BRIEF FOCUS ON THIS, YOU KNOW,

22   MS. CATHELL TRYING TO SHUT DOWN THEIR BUSINESS OR HAVE A

23   MONOPOLY ON SOMETHING OR, YOU KNOW, JUST ESSENTIALLY RUIN THEIR

24   ENTIRE BUSINESS MODEL, AND THAT'S NOT THE CASE.  WE'RE NOT

25   SEEKING FOR HER TO SHUT DOWN HER BUSINESS OR TO CLOSE HER

1   ACCOUNTS OR ANYTHING LIKE THAT.  WE JUST WANT TO PROTECT J.

2   CATHELL'S CONFIDENTIAL PROPRIETARY INFORMATION THAT MS. CATHELL

3   HAS SPENT YEARS AND A LOT OF MONEY FORMULATING.

4           THE COURT:  SO YOU'RE SAYING THAT THE SITE COULD

5   CONTINUE TO LOOK AS IT DOES NOW, IT'S JUST THE BACK-END

6   INFORMATION THAT HAS YOU CONCERNED?

7           MS. AMIRFAZLI:  YES.  NOW, WE DO BRING SOME CLAIMS

8   FOR THE TRADEDRESS, BUT THOSE ARE SECONDARY TO THIS PROTECTING

9   THE TRADE SECRETS.  BUT YOU'RE RIGHT.  SO WE'RE -- WHAT WE'RE

10  SEEKING TO PROTECT IS JUST HER CONFIDENTIAL INFORMATION.  WE'RE

11  NOT TRYING TO --

12          THE COURT:  AND HOW DO YOU KNOW WHAT SHE'S DOING IN

13  THE BACK END OF HER SITE?

14          MS. AMIRFAZLI:  WELL, WITH FILING THIS MOTION, WE

15  WOULD -- YOU KNOW, IF WE HAD A ORDER THAT GRANTED ESSENTIALLY

16  THE LIMITED RELIEF THAT WE'RE REQUESTING, IT WOULD REQUIRE A

17  LITTLE BIT OF SELF-POLICING AND, YOU KNOW, REPRESENTATIONS FROM

18  HER THAT SHE WILL NOT BE USING THAT CONFIDENTIAL INFORMATION.

19  WE HAVE NOT RECEIVED THOSE ASSURANCES.  YOU KNOW, WHEN

20  MS. CATHELL NOTICED THIS WEAR TO WANDER ACCOUNT AND FIGURED OUT

21  MS. MARTIN WAS RUNNING IT WHILE SHE WAS STILL EMPLOYED AT J.

22  CATHELL, SHE APPROACHED HER, AND MS. MARTIN ADMITTED THAT SHE

23  SAW AN OPPORTUNITY AND SHE TOOK IT.  SO SHE HAD -- SHE WAS

24  WORKING, YOU KNOW, THEY WERE WORKING.

25          THE COURT:  SO YOU'RE SAYING SHE ADMITTED THAT SHE'S

23

```
 1    USING THE SAME BACK-END STRATEGY, NOT JUST THE SAME
 2    FORWARD-FACING --
 3           MS. AMIRFAZLI:  THAT'S OUR UNDERSTANDING OF, YES,
 4    WHAT SHE HAS SAID BECAUSE THAT IS HOW, YOU KNOW, SHE SAW -- SHE
 5    WAS ABLE TO SEE WHAT WE DON'T SEE OF HOW SUCCESSFUL EVERYTHING
 6    WAS.  WHAT MS. CATHELL HAD SPENT TIME AND MONEY IMPLEMENTING
 7    AND CREATING AND TRIAL-AND-ERROR PROCESS, SHE SAW THE WAY IT
 8    WENT FROM THE PRE-REBRAND THROUGH THE REBRAND TO, YOU KNOW, THE
 9    TIME IN WHICH SHE WAS TERMINATED.  AND SO SHE SAW THAT.
10           THE COURT:  I THINK YOUR TIME IS UP, SO THANK YOU.  I
11    APPRECIATE THAT.  AND I'LL HEAR FROM DEFENSE COUNSEL NOW.
12           MS. AMIRFAZLI:  THANK YOU, YOUR HONOR.
13           THE COURT:  YOU'RE WELCOME.
14           MR. CONNORS:  GOOD MORNING, YOUR HONOR.
15           THE COURT:  GOOD MORNING.
16           MR. CONNORS:  PLEASURE TO BE HERE.  I'VE -- THIS IS
17    THE FIRST TIME I'VE BEEN IN THIS COURT, SO -- AND I DON'T GET
18    TO GO OVER THERE (VERBATIM) VERY MUCH, BUT -- AND MS. HARRIS,
19    THIS IS THE FIRST TIME OF ANY HEARING WHATSOEVER.  SHE JUST GOT
20    LICENSED, SO WE'RE REALLY HAPPY TO BE HERE.  BUT I KNOW YOU
21    DON'T WANT TO HEAR ALL THAT, SO I WANT TO DUMP INTO -- DIVE IN
22    ALL THESE INTERESTING ISSUES WE'VE GOT BEFORE US.  FROM THE
23    DEFENDANT'S PERSPECTIVE AND, FRANKLY, FROM MY PERSPECTIVE, I'M
24    ESPECIALLY CONCERNED ABOUT THE POLICY THAT IT SEEMS TO BE
25    PROMOTING.  I DON'T THINK -- FROM THE DEFENDANT'S PERSPECTIVE
```

```
1    WHAT IT SEEMS TO BE HAPPENING HERE IS WE'RE TRYING TO
2    MANIPULATE LIMITED MONOPOLIES THAT APPLY TO TRADE SECRETS AND
3    TRADEDRESS, AND EXTEND THEM TO PROTECTING A BUSINESS MODEL OR A
4    GENERALIZED AESTHETIC THAT, BY ALL ADMISSIONS, EVERYBODY DOES,
5    A LOT OF PEOPLE DO.  YOU KNOW, IT EVEN BEGS THE QUESTION AS WE
6    SIT HERE AND TALK ABOUT -- HEAR YOU AND PLAINTIFF'S COUNSEL
7    TALK ABOUT COPYCATS, WHO'S THE COPYCAT?  YOU KNOW, WE DON'T
8    EVEN KNOW, RIGHT, WHO CAME FIRST.  I THINK THE COURT CAN EVEN,
9    FRANKLY, TAKE JUDICIAL NOTICE OF THE FACT WE JUST SCROLL
10   THROUGH INSTAGRAM, YOU CAN SEE A LOT OF THINGS LIKE THIS,
11   RIGHT.  NOW, OBVIOUSLY WE HAVE TO DIVE INTO THE SPECIFICS,
12   RIGHT.  AND SINCE WE'VE TALKED A LOT ABOUT IT ALREADY, I'LL
13   START WITH TRADE SECRETS.
14        I HAVE TO SET THE RECORD STRAIGHT.  I DON'T SEE ANYWHERE
15   IN THE RECORD WHERE MY CLIENT ADMITTED TO USING ANY
16   CONFIDENTIAL INFORMATION.  FRANKLY, WE REALLY DON'T KNOW WHAT
17   IT IS.  I'M VERY CONCERNED BY THAT BECAUSE ALL THE LAW SAYS IS
18   IT HAS TO BE -- CLEARLY WE DON'T EXPECT THE PLAINTIFF TO
19   LITERALLY TELL US NUMBERS OR SOURCE CODE OR WHATEVER THE TRADE
20   SECRET MAY BE IN A PARTICULAR CASE.  THERE'S A BALANCE BETWEEN
21   DISCLOSING THE TRADE SECRET AND GIVING US BOUNDARIES OVER WHAT
22   THE TRADE SECRET IS, BUT WE WHAT WE HAVE IS JUST BOILERPLATE
23   FORMULAS, MARKETING STRATEGY, BASICALLY THE WORDS THAT SHOW UP
24   IN THE GEORGIA TRADE SECRETS ACT, THE UNIFORM TRADE SECRETS
25   ACT, AND THE DEFEND -- FEDERAL DEFEND TRADE SECRETS.  I -- FOR
```

25

1    THE LIFE OF ME, I DON'T KNOW WHAT IT IS.  AND WHAT I'M

2    CONCERNED BY IS WHAT IT SOUNDS LIKE THE COURT IS CONCERNED BY,

3    EVERYTHING THAT WE'VE DISCUSSED IS PUBLICLY AVAILABLE.  IF

4    WE'RE TALKING ABOUT TIMING, ADVERTISING CAN BE SEEN BY THE

5    PUBLIC.  IT SEEMS THAT BY ALL ADMISSIONS LIKE TO KNOW SEES A

6    LOT OF THIS STUFF AND THEY'RE CLEARLY SOMEBODY THAT'S NOT

7    WITHIN THE SPHERE OF TRADE SECRET PROTECTABILITY EITHER.

8         WE EVEN GO TO -- THERE'S A COUPLE OF CASES, ONE IN

9    PARTICULAR THAT MIGHT BE NOTABLE, THAT WERE CITED IN THE REPLY

10   BRIEF.  THERE'S ESSEX GROUP VS. SOUTH WIRE COMPANY, AND THAT'S

11   A REALLY GOOD EXAMPLE FOR OUR SIDE.  IN THAT CASE WE HAD

12   POTENTIAL THEFT OF THE SOURCE CODE, AND IT SAYS LITERALLY

13   SOURCE CODE.  AND THEN THEY THOUGHT ABOUT BASICALLY, WELL, HOW

14   SPECIFIC DO YOU HAVE TO BE ABOUT WHAT THE SOURCE CODE IS?  DO

15   YOU HAVE TO PRODUCE THE SOURCE CODE?  WELL, OF COURSE THE

16   ANSWER IS, NO, BECAUSE THEN YOU DIVULGE THE TRADE SECRET, BUT

17   WE KNOW WE'RE TALKING ABOUT SOURCE CODE THAT PROGRAMMERS WROTE.

18   I STILL DON'T KNOW WHAT WE'RE TALKING ABOUT HERE TODAY.

19         THE COURT:  WELL, I GUESS WHAT I HEAR FROM THE

20   PLAINTIFF'S PERSPECTIVE, WHAT THEY'RE SAYING IS THAT THEIR

21   ALLEGATION IS THAT WHEN WE PEEL BACK THE LAYERS AND LOOK AT

22   WHAT DEFENDANT IS DOING, WHAT WE'RE GOING TO SEE IS THAT THE

23   TIMING, THE COMBINATIONS OF HOW THEY APPROACH, LIKE, DIFFERENT

24   COMPANIES AND ALL OF THAT IS GOING TO LOOK THE SAME.  SO WHEN

25   WE PULL BACK THE LAYER AND WE COMPARE EVERYTHING THAT'S GOING

26

1    ON IN TERMS OF THE BACK-END THING, THAT IS GOING TO BE

2    IDENTICAL.  AND THAT THAT IS THE PROBLEM, IS THAT ALL OF THAT

3    STRATEGY AND ALL OF THAT IS GOING TO BE THE SAME WHEN WE LOOK

4    BACK AT THAT.  THAT'S MY UNDERSTANDING OF THEIR POSITION.

5            MR. CONNORS:  AND I WOULD AGREE.  I AGREE THAT'S

6    THEIR POSITION, BUT I'D SAY WHERE IS THAT ACTUALLY PLED IN

7    THE -- AND ALLEGED IN THE PARTICULARS?  AND WHAT I MEAN BY THAT

8    IS WHAT I THINK IS PLED AND ALLEGED IN DECLARATIONS IS, IT HAS

9    THE SAME LOOK AND FEEL.  BASICALLY THEY DESCRIBE A TRAVEL BLOG

10   WHERE YOU SAY, WOULDN'T YOU LIKE TO TRAVEL TO THIS DESTINATION

11   AND WOULDN'T IT BE GREAT TO WEAR THIS ENSEMBLE THAT DAY?  BUT

12   WHAT -- BUT (VERBATIM) YOUR HONOR JUST DESCRIBED WOULD REQUIRE

13   EVIDENCE OF ON THIS DAY I POSTED ABOUT TRAVELING TO ROME AND

14   WEARING THESE PARTICULAR PRODUCTS, AND WEAR TO WANDER DID THE

15   SAME THING THAT'S NOT ALLEGED ANYWHERE.  AND TRUTH BE TOLD, I

16   DON'T THINK THAT EVER HAPPENED, RIGHT.  SO I DON'T THINK THAT'S

17   PLED OR ALLEGED, AND THEY HAVE A HEAVY BURDEN TO MEET TO GET

18   WHAT THEY'RE ASKING FOR, VERY HEAVY BURDEN TO MEET.  CERTAINLY

19   PERHAPS, YOU KNOW, MAYBE IN DISCOVERY THEY FIND SOMETHING LIKE

20   THAT, BUT NONE OF THAT IS IN THE RECORD AT THE MOMENT.  I DON'T

21   THINK THEY'RE GOING TO FIND SOMETHING LIKE THAT.  IT'S

22   CERTAINLY ALL PUBLICLY AVAILABLE, IF THEY WANTED TO, TO PLEAD

23   SUCH A THING.  AND I THINK IT BEARS TO YOUR HONOR'S POINT -- I

24   KEPT WRITING THIS DOWN AS Y'ALL WERE TALKING -- IT SEEMS THAT

25   THERE'S A -- ALMOST A PROXIMATE CAUSE ISSUE IN THAT THAT'S THE

1  SORT OF THING I JUST DESCRIBED THAT YOU WOULD NEED TO SHOW,

2  RIGHT, THAT YOU WOULD NEED TO SHOW THAT HER TIMING WAS

3  IMPECCABLE, SHE WAS BEATING HER TO THE PUNCH PERHAPS EVEN.  AND

4  NONE OF THAT'S ALLEGED.  NONE OF THAT'S ALLEGED, AND I DON'T

5  THINK ANY OF THAT ACTUALLY EXISTS.

6       ON THAT NOTE AS WELL, YOUR HONOR, I'M CURIOUS TO KNOW, YOU

7  KNOW, FOCUSING ON THOSE OTHER ELEMENTS, NOT JUST THE MERITS,

8  BUT THE OTHER ELEMENTS, INJUNCTIVE RELIEF.  IT SEEMS WE DON'T

9  EVEN KNOW WHAT THE DAMAGES ARE.  AND ON THE ONE HAND YOU CAN

10 SAY, WELL, MAYBE WE CAN USE DISCOVERY TO FIND THAT OUT, IN

11 WHICH CASE THE COURT SHOULD GRANT THE INJUNCTION.  AND ON THE

12 OTHER HAND WOULD SAY, WELL, IF YOU DON'T HAVE ANY DAMAGES,

13 THAT'S A NECESSARY ELEMENT, SO YOU LOSE ALL TOGETHER.  AND

14 WHAT'S CURIOUS TO ME IS THIS ISN'T LIKE GOING OUT AND BUYING

15 LUNCH TODAY, RIGHT.  IF I SAY I'M GOING TO GO TO MCDONALD'S

16 TODAY, THEN THAT'S TO THE DETRIMENT OF WENDY'S, RIGHT.  IT'S AN

17 EITHER/OR PROPOSITION.  THIS IS NOT AN EITHER/OR PROPOSITION.

18 IT COULD ONLY BE AN EITHER/OR PROPOSITION IN THE SCENARIO I

19 JUST DESCRIBED.  AND THAT'S NOT ALLEGED.  WHAT WE'RE ALLEGING

20 IS -- TALKING ABOUT IS GENERAL AESTHETICS, NOT SPECIFIC POST

21 WITH SPECIFIC EXACTING CONTENT.  NONE OF THAT'S ALLEGED

22 ANYWHERE.  AND SO I THINK THAT'S A VERY CRITICAL DIFFERENCE.

23 SO ON TRADE SECRETS, I DON'T THINK WE KNOW WHAT THE BOUNDARIES

24 ARE OF THE TRADE SECRET.  AND I THINK THE COURT, ESPECIALLY

25 UNDER RULE 65, IN CONTEMPLATING ISSUING SUCH A ORDER, IT HAS TO

1    BE VERY SPECIFIC.  AND WE STRONGLY DISAGREE THAT THIS IS NOT

2    NARROWLY TAILORED, RIGHT.  WHAT THEY'RE ASKING FOR IS THAT MY

3    CLIENT PUT HER INSTAGRAM IN ARCHIVE MODE.  IN OTHER WORDS,

4    SHIELD IT FROM PUBLIC VIEW, WHICH WOULD MAKE IT WORTHLESS FOR

5    THE DURATION OF THE PROCEEDING.  SO PERHAPS MONTHS OR LONGER,

6    RIGHT, HER BUSINESS IS SHUT DOWN.  THAT'S WHAT THEY'RE ASKING

7    FOR.  I -- GRANTED THEY'RE NOT ASKING FOR DELETION, RIGHT.  BUT

8    IT STOPS RIGHT HERE AND NOW.  THAT'S WHAT THEY'RE ASKING FOR.

9        IT SEEMS THE OTHER THING THAT'S QUITE OVERBROAD IS THEY'RE

10   ASKING THE COURT TO SORT OF LET THEM FISH THROUGH ALL MY

11   CLIENT'S ELECTRONICS LOOKING FOR A TRADE SECRET THAT'S NOT

12   DEFINED, RIGHT.  THERE HAS TO BE SOME EXACTINGNESS (VERBATIM)

13   THERE TO SOME DEGREE.  EVEN DISCOVERY WOULD, RIGHT, PUT SOME

14   CONFINES OVER WHAT PEOPLE CAN LOOK FOR WHEN THEY'RE LOOKING FOR

15   TRADE SECRET.  SO I THINK WE NEED TO KNOW WHAT THE TRADE SECRET

16   IS.

17       I DON'T KNOW.  I DON'T THINK THERE'S A LOT MORE FOR ME TO

18   SAY ABOUT THE TRADE SECRET ISSUES OTHER THAN IT'S JUST NOT

19   WELL-DEFINED, ALTHOUGH I WILL ADD I THINK IT IS IMPORTANT FOR

20   THE COURT TO NOTE, WHICH REALLY WASN'T DISCUSSED FROM THE

21   PLAINTIFFS UP HERE, IS WHAT REASONABLE MEANS HAVE BEEN USED

22   HERE, RIGHT.  SO EVEN IF WE GRANT THAT IT'S BEEN PROPERLY

23   DEFINED, THEN THE NEXT QUESTION IS WHAT PROPER MEANS HAVE BEEN

24   USED.  THE ONLY THING INVOKED BY THE PLAINTIFF IS THERE'S

25   PASSWORDS.  CLEARLY BY CONTEXT THOSE PASSWORDS ARE, SAY, ON

29

1  INSTAGRAM.  IF ANY OF US GO -- SET UP AN INSTAGRAM ACCOUNT,

2  THERE'S A PASSWORD.  THAT'S SIGNIFICANT BECAUSE THAT'S NOT

3  SOMETHING THAT THE PLAINTIFF IMPLEMENTED HERSELF.  AND THE

4  PASSWORD'S MEANT TO KEEP OUT EVERYBODY BUT MY CLIENT OR THE

5  OWNER, MS. CATHELL.  SORRY.  I HAVE TO PAUSE.  I WAS

6  PRONOUNCING IT DIFFERENTLY.  MS. CATHELL.  THERE'S NOTHING IN

7  WRITING.  THERE'S NO CONTRACT SAYING, KEEP THESE THINGS SECRET.

8  AND I DON'T THINK THERE WAS REALLY -- THE ACTUAL EXHIBIT

9  SUBMITTED --

10         THE COURT:  WELL, I THINK THAT THERE IS NOT

11 NECESSARILY A REQUIREMENT.  I MEAN, CERTAINLY IT'S BETTER THAT

12 THERE IS MORE FORMALITY WITH THE NON-COMPETE OR A

13 CONFIDENTIALITY AGREEMENT OR SOMETHING IN THAT RESPECT.  BUT, I

14 MEAN, I DO THINK THAT THIS CAN ESTABLISHED WITH OF COURSE THE

15 DEALING AND EXPECTATIONS AND KIND OF MORE OF THIS INFORMAL TYPE

16 EVIDENCE TO SHOW THAT THERE IS THIS EXPECTATION AND THIS KIND

17 OF -- THESE STATEMENTS THAT WERE MADE BY THE DEFENDANT IN THESE

18 MESSAGES THAT INDICATED THAT SHE UNDERSTOOD THAT THIS WAS KIND

19 OF A SECRET-TYPE THING BETWEEN THOSE TWO.

20         MR. CONNORS:  I AGREE.  YOU CERTAINLY DON'T NEED A

21 WRITTEN CONTRACT PER SE, BUT I THINK IT'S VERY IMPORTANT.  THE

22 OTHER ISSUE I THINK THAT EXISTS THERE IS THE ACTUAL EVIDENCE,

23 IF YOU LOOK AT THOSE EXHIBITS, IS NO WHERE ANYBODY SAYING, HEY,

24 DID YOU KNOW THIS THING, RIGHT, THIS PARTICULAR DATA, WHICH IS

25 NEVER IDENTIFIED, AGAIN, IS SECRET AND I DON'T WANT YOU TO

 1   DISCLOSE IT?  THE CLOSEST I SEE IN ONE OF THE TEXTS THAT WERE
 2   PRESENTED IN THE ORIGINAL COMPLAINT IS ALLUDING TO FINANCIAL
 3   DATA.  BUT THEN I THINK YOU GO BACK TO THIS CAUSAL PROBLEM WE
 4   HAVE, WHICH IS, HOW WOULD KNOWLEDGE OF PARTICULAR PROFITABILITY
 5   BE ACTUALLY ANYTHING THAT MY CLIENT WOULD USE OR HAS BEEN
 6   ALLEGED TO BE USED TO HER ADVANTAGE?  SO THERE HAS TO BE
 7   SOMETHING.  I WOULD AGREE IT DOESN'T ABSOLUTELY HAVE TO BE A
 8   WRITTEN CONTRACT, BUT IT OUGHT TO BE UNDER THESE CIRCUMSTANCES
 9   AND WITHOUT THAT, IT'S HER HEAVY BURDEN TO PROVE, RIGHT, TO GET
10   AN INJUNCTION OF THIS KIND, THERE WAS AN ACTUALLY, NOT JUST
11   UNDERSTANDING, BUT AGREEMENT, RIGHT, ESPECIALLY IF SHE'S AN
12   INDEPENDENT CONTRACTOR, THAT THESE CERTAIN THINGS WERE SUPPOSED
13   TO BE KEPT CONFIDENTIAL, WHATEVER THOSE THINGS ARE.  SO I THINK
14   THAT'S STILL SIGNIFICANT.
15        TO MOVE TO THE -- I'LL SAY TRADEDRESS AND AN OVERARCHING
16   THING THAT DOES CONCERN ME, ESPECIALLY WITH REGARD TO ELEMENT
17   FOUR OF -- FOR INJUNCTIVE RELIEF, SO THAT IS THE POTENTIAL HARM
18   TO THE PUBLIC.  AGAIN, I THINK THERE'S A VERY, VERY BROAD
19   POTENTIAL ABUSE OF THE LIMITED MONOPOLY POWER THAT MIGHT ATTACH
20   TO TRADEDRESS, RIGHT.  IF WE'RE TRYING TO CONVERT TRADITIONAL
21   TRADE DRESS PROTECTION LIKE THE WRAPPER ON A CANDY BAR, WE'RE
22   TRYING TO CONVERT THAT TO PROTECTION OF AN INSTAGRAM, A
23   GENERALIZED INSTAGRAM AESTHETIC OR A BUSINESS MODEL.  AND
24   THAT'S SIGNIFICANT.  AND THE -- AND THE REQUESTED ORDER
25   REFLECTS MAKE THIS ARCHIVAL.  NOW, GRANTED, I UNDERSTAND THE

```
1   ORDER ONLY APPLIES TO MY CLIENT, BUT CONCEIVABLY THE REASONING
2   APPLIES TO EVERYBODY.  EVERY COPYCAT ACCOUNT THIS REASONING
3   APPLIES TO IF SHE HAS PROTECTABLE TRADEDRESS OF THE KIND
4   DEFINED IN THE COMPLAINT.  AND WHAT'S UNUSUAL ABOUT WHAT'S
5   DEFINED IN THE COMPLAINT IS THAT IT'S NOT -- FOR EXAMPLE, A
6   GOOD EXAMPLE, I THOUGHT WE WERE IN ATLANTA.  IT MIGHT BE A GOOD
7   EXAMPLE, COCA-COLA, VERY SIMPLE TRADEDRESS.  IT HAS A
8   PARTICULAR SHAPE, IT HAS A PARTICULAR DISTINCTIVE RED
9   BACKGROUND, HAS A DISTINCTIVE FONT STYLE, WHICH PROBABLY HAS A
10  NAME.  I DON'T KNOW IT.  AND IT SAYS COCA-COLA.  MAYBE IT SAYS
11  CLASSIC OR CHERRY OR WHATEVER THE FLAVOR IS, RIGHT.  YOU NOTICE
12  THERE'S NO COLOR ALLEGED IN THE DESCRIPTION IN THE COMPLAINT
13  WHAT THIS TRADEDRESS IS.  THERE'S NO PARTICULARIZED FONT STYLE.
14  THERE'S NO PARTICULARIZED NAME.  IN FACT I THINK BY ALL
15  ADMISSIONS EVERYBODY KNOWS THE COURT CAN TAKE JUDICIAL NOTICE
16  OF THE FACT THAT IF YOU GO LOOK AT THESE ACCOUNTS ON INSTAGRAM,
17  THE FIRST THING PROBABLY ANY READER SHOULD NOTICE IS THE
18  ACCOUNT NAME AND THE PICTURE ASSOCIATED.  IF YOU GO TO
19  MS. CATHELL'S ACCOUNT, YOU SEE HER PICTURE AND YOU SEE J.
20  CATHELL AFTER EVERY SINGLE POST AND YOU SEE A WATERMARK IN
21  EVERY SINGLE POST.  SO WHAT WE'RE LEFT WITH IS BASICALLY A
22  CLAIM TO LAYERING, WHICH THEY'VE ALREADY ADMITTED IN REPLY,
23  THAT'S FUNCTIONAL, WHICH CAN'T BE PROTECTABLE BECAUSE IT
24  MANIPULATES POTENTIALLY THE ALGORITHM THAT LIKE TO KNOW AND
25  INSTAGRAM USE.  AND WHAT ARE WE LEFT WITH, WELL, IT LITERALLY
```

UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT

1    DESCRIBES PAIRING AN OUTFIT WITH A PARTICULAR DESTINATION.

2    THAT'S JUST NOT TRADEDRESS.  WE'RE NOT DESCRIBING WRAPPERS AND

3    PRODUCT PACKAGING.  AND IN THIS CASE WHEN WE'RE TALKING ABOUT

4    PRODUCT DESIGN -- AND THE SUPREME COURT CASES WE CITED, VERY

5    HEAVY BURDEN TO DEMONSTRATE THAT PRODUCT DESIGN IS

6    TRADEDRESS-PROTECTABLE BECAUSE NOW YOU'RE GETTING IN THE PATENT

7    AREA AND YOU'RE TRYING -- POTENTIALLY YOU MIGHT BE GIVING A

8    MONOPOLY TO A WHOLE PRODUCT RATHER THAN PARTICULAR SOURCE

9    INDICATOR BRANDING ON THE PRODUCT.  AND SO THAT IS, I THINK, AN

10   EXCEPTIONAL THING THE COURT NEEDS TO CONSIDER.  THIS ISN'T

11   TRADEDRESS-PROTECTABLE.  AND, MOREOVER, IT WOULD BE VERY

12   ONEROUS TO ISSUE AN ORDER OF THAT KIND BECAUSE THAT REASONING

13   WOULD APPLY TO COUNTLESS OTHERS ON INSTAGRAM IF YOU CAN PROTECT

14   THE NATURE OF THIS BLOG IN WHICH IT PAIRS OUTFITS WITH

15   DESTINATIONS.  AND A PARTICULAR NOTE, YOUR HONOR, THE --

16   THERE'S TWO FUNCTIONALITY DOCTRINES REMEMBER.  IT'S PLAINTIFF'S

17   BURDEN TO PLEAD THAT IT'S NON-FUNCTIONAL.  THAT'S WRITTEN IN

18   THE LANHAM ACT.  THERE'S TWO FUNCTIONALITY DOCTRINES WHERE THIS

19   FAILS ON.  THE ONE IS CALLED THE CLASSIC DOCTRINE.  IT'S STATED

20   IN CASES LIKE TRAFFICS (PHONETIC), U.S. SUPREME COURT CASE

21   INVOLVING A ROAD SIGN WITH A SPRING (PHONETIC).  THERE ARE

22   OTHERS.  ANOTHER PROMINENT ONE WE TALK ABOUT IS LOUBOUTIN, THE

23   FAMOUS SHOE WHERE THEY HAVE A RED UNDERSOLE, BUT THEY TRY TO

24   ASSERT, HEY, WE HAVE -- WE HAVE PROTECTION, TRADEDRESS

25   PROTECTION OVER AN ENTIRELY RED SHOE MADE BY YVES SAINT

```
1   LAURENT1.  AND EVERY TIME THOSE COURTS SAID, HEY, LET'S DIAL IT
2   BACK, THAT IS TOO BROAD.  YOU CAN'T CLAIM THAT, RIGHT.  AND
3   ESPECIALLY THERE YOU HAVE A FUNCTIONALITY ISSUE.  AND MOST
4   SIGNIFICANTLY IN THIS CIRCUIT THE DIPPIN' DOTS CASE VS. -- I
5   ALWAYS FORGET THE LAST NAME -- FROSTY BITES, RIGHT, WHERE WE
6   SAY, HEY, IF THIS HAS SOME FUNCTIONAL PURPOSE THAT IS ALGORITH
7   (VERBATIM) OF IT, END OF DISCUSSION.  YOU CAN'T PROTECT IT.
8   AND IN THIS CASE WE HAVE A LOT OF FUNCTIONAL PURPOSES.  THE
9   LIKE TO KNOW ALGORITHM AND MANIPULATION IS ONE, BUT MERELY THE
10  FACT OF, IS THIS DICTATED BY THE CIRCUMSTANCES OF INSTAGRAM?
11  AND IT IS.  THERE'S ONLY SO MUCH REAL ESTATE TO PUT TEXT DOWN
12  AND PICTURES DOWN.  SO OF COURSE IF YOU ENDEAVOR TO MAKE A
13  TRAVEL BLOG IN WHICH YOU'RE GOING TO PUT OUTFITS WITH TRAVEL
14  DESTINATIONS, THEN THIS IS SELF-FULFILLING.  AND THE COURTS SAY
15  AND THE ELEVENTH CIRCUIT HAS SAID THAT'S A KILLER, THAT MAKES
16  IT FUNCTIONAL.  DIPPIN' DOTS WAS THAT CASE.  IF YOU WANT TO
17  MAKE FLASH-FREEZE ICE CREAM THAT COME UP IN LITTLE BEADS, WELL,
18  THE PROCESS OF MAKING IT MAKES THEM COME UP IN LITTLE BEADS, SO
19  IT'S DICTATED BY THE PLATFORM, THE PRODUCT YOU'RE MAKING
20  ITSELF, AND WE'RE NOT GOING TO ALLOW A MONOPOLY ON THAT.
21      THEN THERE'S AESTHETIC FUNCTIONALITY THAT SAYS EVEN
22  GRANTING THAT, IF YOU'VE UNNECESSARY LIMITED POTENTIAL
23  COMPETITORS TO ONLY A FEW VARIATIONS, YOU STILL LOSE.  IT'S
24  STILL FUNCTIONAL.  AND, AGAIN, WE HAVE THE PROBLEM OF JUST VERY
25  LIMITED REAL ESTATE ON INSTAGRAM.  SO I THINK THAT'S ESPECIALLY
```

 1    SIGNIFICANT.  FORGIVE ME, YOUR HONOR, I'M TRYING -- I DON'T

 2    KNOW WHY I'M CONFUSED.  I'VE GOT PLENTY OF TIME.

 3            THE COURT:  YOU'VE GOT 15 MINUTES.

 4            MR. CONNORS:  15 MINUTES.  OKAY.  FORGIVE ME.

 5            THE COURT:  YES.

 6            MR. CONNORS:  AND THAT GOES TO IRREPARABLE INJURY.  I

 7    THINK YOUR HONOR IS RIGHT.  IN THE WORST CASE SCENARIO THIS CAN

 8    BE -- THIS COULD BE FIXED BY MONEY.

 9            THE COURT:  WELL, AND EXPLAIN -- I THINK THAT IT'S --

10    IT IS A LITTLE COMPLICATED IN TERMS OF I CAN SEE A SCENARIO

11    WHERE THE PLAINTIFF CAN BASICALLY ARGUE THAT ALL THIS SUCCESS

12    IS DUE TO THE STOLEN CONFIDENTIAL INFORMATION OR TRADEDRESS OR

13    UNJUST ENRICHMENT OR ONE OF THESE CLAIMS THAT THEY'RE DEALING

14    WITH.  AND THERE ARE A LOT OF CLAIMS HERE.  BUT I THINK WHAT'S

15    MORE LIKELY IS THAT THERE ARE SOME PURCHASES AND THINGS THAT

16    HAPPEN APART FROM THE CONFIDENTIAL INFORMATION OR WHATEVER

17    CLAIM WE'RE GOING ON.  SO IT DOES SEEM LIKE IT IS GOING TO BE

18    VERY DIFFICULT TO PARSE OUT WHAT IS DUE TO THE CONFIDENTIAL

19    INFORMATION OR SOME OF THESE OTHER THEORIES VERSUS WHAT WAS

20    JUST, OH, I LIKE THAT PURSE, YOU KNOW, IT'S CUTE, I BOUGHT IT,

21    THAT SALE MAYBE SHOULDN'T GO TO THE DAMAGES.  AND PARSING OUT

22    WHY INDIVIDUAL PEOPLE MADE THAT PURCHASE SEEMS VERY DIFFICULT.

23            MR. CONNORS:  I WOULD AGREE IT WOULD BE DIFFICULT,

24    BUT I THINK THAT DIFFICULTY WEIGHS AGAINST THE PLAINTIFF

25    BECAUSE IT'S THEIR BURDEN TO PROVE DAMAGES IN THE FIRST PLACE.

```
 1  IT'S NOT THE SAME TO SAY, BECAUSE IT'S HARD TO PROVE DAMAGES,
 2  WE'RE IRREPARABLY HARMED.  WELL, NOW THEY JUST HAVE A DAMAGES
 3  ISSUES, WHICH REALLY GOES TO AN ELEMENT OF ANY CLAIM YOU PLEAD
 4  AT ALL, RIGHT.  ANY ELEMENT REQUIRES DAMAGES.  THE COURT
 5  DOESN'T DEAL IN TRIFLINGS, RIGHT.  SO THAT'S SIGNIFICANT FOR
 6  THE PLAINTIFF.  AND HERE AT THIS STAGE THEY HAVE A VERY HEAVY
 7  BURDEN TO SAY I'M BEING DAMAGED IN SOME WAY, RIGHT.  AND IT'S
 8  NOT -- AND IT'S NOT JUST TO SAY, WELL, IT'S HARD TO MEASURE.
 9  IT DOESN'T SOUND LIKE IT MAY BE DAMAGES AT ALL BECAUSE, AGAIN,
10  IT'S NOT THE SAME AS ME GOING AND DECIDING I'M GOING TO EAT AT
11  MCDONALD'S TODAY AND NOT BURGER KING.  IF BURGER KING WERE
12  RUNNING FALSE ADS, THEN YOU MIGHT BE ABLE TO SHOW RELATIONSHIP
13  BETWEEN THE TWO IF I MADE A PURCHASING DECISION AS A RESULT.
14  THERE'S A WHOLE BUNCH OF DOMINOES THAT HAVE TO FALL IN THIS
15  CASE BEFORE WE GET TO THAT CONCLUSION.  AND IT'S THEIR BURDEN
16  AND THEY HAVE A HEAVY BURDEN TO SHOW THAT.  AND I DON'T THINK
17  THEY'VE SHOWN THAT AT ALL.  TRADITIONALLY IN CASES, ESPECIALLY
18  INVOLVING TRADEDRESS MISAPPROPRIATION, BUT ANYTHING, I GUESS
19  WE'D BE DEALING WITH TRADE SECRETS TOO, DEALING WITH
20  COMPETITORS.  NOW, I SUPPOSE WE SHOULD SAY YOU NEED SOME KIND
21  OF THIRD-PARTY EVIDENCE, RIGHT, SURVEYS OF CONSUMERS, AT LEAST
22  EVEN -- EVEN WITH REGARD TO THIS RELATED ISSUE OF WHETHER THERE
23  MIGHT BE CONFUSION, I HEARD THAT BROUGHT UP, WHY DOES THIS
24  THING LIKE THIS.  WELL, IF WE DRAW THAT BACK TO OUR DISCUSSION,
25  THAT SAYS NOTHING TO US, THAT TELLS US NOTHING ABOUT DID
```

1  SOMEBODY PURCHASE THIS PURSE THROUGH A LINK FROM MY CLIENT

2  VERSUS MS. CATHELL.  WHO KNOWS.

3        THE COURT:  WELL, AND I WAS JUST THINKING ABOUT

4  CONFUSION.  IT DOES SEEM LIKE CONFUSION IN THIS ARENA IS A

5  DIFFERENT CONCEPT THAN IN SOME DIFFERENT PRODUCTS-TYPE CASES

6  WHERE YOU HAVE -- I MEAN, MAYBE THIS IS TRUE IN THIS SPACE, BUT

7  IT SEEMS TO ME THAT CUSTOMERS ARE MORE INTERESTED IN THE

8  PRODUCT, WHETHER THEY LIKE IT OR NOT, THAN NECESSARILY BRAND

9  LOYALTY TO SOMEONE THAT RUNS A SITE.  AND SO CONFUSION IS AN

10  INTERESTING ISSUE HERE BECAUSE EVEN IF THERE IS CONFUSION, THAT

11  DOESN'T NECESSARILY MEAN THAT SOMEONE WAS GOING WITH -- IT'S A

12  DIFFERENT CONCEPT WITH THESE BLOGS THAN I THINK IT WOULD BE,

13  LIKE, I'M TRYING TO BUY A KIND OF GLUE, I THOUGHT THIS WAS THIS

14  GLUE AND NOT THAT GLUE.  THEY ACTUALLY ARE BUYING THE PURSE

15  THAT THEY WANT.

16        MR. CONNORS:  I AGREE, YOUR HONOR, BECAUSE CONFUSION,

17  YOU KNOW, TALKING ABOUT TRADEDRESS -- IT'S AN ELEMENT OF

18  TRADEMARK INFRINGEMENT -- WOULD NOT BEAR ON THE PARTICULAR

19  PRODUCT THEY'RE ADVERTISING THAT DAY.  THE CONFUSION WOULD HAVE

20  TO BE, I WAS LOOKING AT WEAR TO WANDER.  THAT'S THE PRODUCT,

21  RIGHT.  THE PRODUCT IS THE BLOG ITSELF, THE INSTAGRAM ACCOUNT

22  ITSELF.  SO THE CONFUSION THAT THE PLAINTIFF WOULD HAVE TO SHOW

23  IS, I WAS LOOKING AT WEAR TO WANDER THINKING IT WAS J. CATHELL.

24  AND THAT'S, I THINK ON ITS FACE, JUST CAN'T BE TRUE BECAUSE OF

25  THE NATURE OF INSTAGRAM AND THAT YOU CAN SEE WHO THE ACCOUNTS

1   BELONG TO AND THERE ARE WATERMARKS.  LAYOUT IS NOT SOURCE

2   INDICATOR.  SO ANYBODY THAT SAYS TO MS. CATHELL OR ANYBODY ELSE

3   THAT SIMPLY SAYS, MAN, THESE TWO LOOK ALIKE, THAT'S NOT

4   TRADEMARK CONFUSION, RIGHT.  THAT'S SOMETHING ELSE.  THAT MIGHT

5   BE A RANGE OF THINGS, RIGHT.  THAT MIGHT BE ANYTHING FROM, YOU

6   SHOULD STOP THAT COPYCAT.  I MEAN, AS AN I.P. ATTORNEY I GET

7   THAT ALL THE TIME, BUT WE HAVE TO BE A LITTLE BIT MORE EXACTING

8   THAN THAT AS FAR AS TRADEMARK LAW IS CONCERNED.  SO REALLY I

9   THINK WHAT YOUR HONOR IS DESCRIBING IS BRAND LOYALTY IN THIS

10  CASE -- MAN, I KEEP USING THE EXAMPLE OF MCDONALD'S.  MAYBE I

11  HAVE A LITTLE BRAND LOYALTY TO MCDONALD'S, RIGHT.  BUT BRAND

12  LOYALTY HERE IS I FOLLOW J. CATHELL ON INSTAGRAM AND I LIKE THE

13  FASHIONS SHE PUSHES AND I'D BE INTERESTED IN PURCHASING THOSE

14  THINGS AND I LOOK AT HER ALL THE TIME.  THAT DOESN'T SEEM TO

15  REALLY INTERFERE WITH SOMEBODY WHO SAYS, YOU KNOW WHAT, I LIKE

16  WEAR TO WANDER BETTER BECAUSE I LIKE THEIR PICS OR I LIKE THE

17  TEXTS THEY WRITE, WHICH IS ALL GOING TO VARY, RIGHT, THE

18  DESCRIPTIVE TEXTS AND THE TRAVEL DESTINATIONS WENT WHEREVER

19  ELSE.  AND WHAT'S CRITICAL, TOO, IS IF YOU GO -- YOU KNOW, AND

20  JUST PULL UP INSTAGRAM AND LOOK AT THESE TWO ACCOUNTS, J.

21  CATHELL IS PROMINENT, RIGHT.  SHE -- HER FACE AND SHE'S

22  MODELING THE CLOTHES IN MANY OF HER POSTS.  PEOPLE DON'T LOOK

23  AT AN INDIVIDUAL POST ON INSTAGRAM.  THEY LOOK AT THE WHOLE

24  PANOPLY OF POSTS.  IF YOU LOOK AT MY CLIENT'S POST, YOU'LL

25  NEVER -- YOU KNOW, THE FIRST TIME YOU MAY HAVE SEEN HER FACE IS

```
 1   TODAY.  SHE DOESN'T SHOW UP ON ANY OF THOSE THINGS.  THAT'S
 2   SUBSTANTIALLY DIFFERENT.  I DON'T SEE HOW CONFUSION COULD
 3   RESULT, AND, THEREFORE, THERE'S A LOW LIKELIHOOD OF SUCCESS ON
 4   THE MERITS OF THIS GIVEN THOSE CIRCUMSTANCES.
 5        THE COURT:  WHY DON'T YOU TALK ABOUT THE EMPLOYEE
 6   INDEPENDENT CONTRACTOR ISSUE.  I DIDN'T TALK WITH PLAINTIFF'S
 7   COUNSEL ABOUT THAT, BUT IT IS AN IMPORTANT ISSUE THAT I'M
 8   FAMILIAR WITH FROM THE BRIEFING.
 9        MR. CONNORS:  YES, YOUR HONOR.  IT'S AN INTERESTING
10   PROBLEM BECAUSE ON THE ONE HAND JUST AT THE OUTSET I'D SAY SOME
11   OF THE ISSUES WE JUST TALKED ABOUT DON'T RELY UPON IT, RIGHT.
12   YOU CAN CONCLUDE THAT THERE'S NO BOUNDED TRADE SECRET AND YOU
13   DON'T HAVE TO MAKE ANY CONCLUSION ABOUT EMPLOYMENT VERSUS
14   INDEPENDENT CONTRACTOR.  YOU CAN CONCLUDE THIS ISN'T
15   TRADEDRESS -- THAT TRADEDRESS IS NOT RELATED TO IT AT ALL.
16        THE COURT:  RIGHT.
17        MR. CONNOR:  BUT AS TO EMPLOYMENT, AT A MINIMUM, I
18   THINK AT A VERY MINIMUM WE HAVE A SIGNIFICANT FACT DISPUTE THAT
19   MIGHT ALTER THE CALCULUS.  AND IN MY ESTIMATION IT'S ON A
20   SPECTRUM.  NO MATTER WHOSE LAW YOU LOOK AT -- AND IT'S
21   INTERESTING BECAUSE THE ONLY LAW WE REALLY HAVE TO LOOK AT IS
22   WAGE AND HOUR, WORKER'S COMP.  THERE IS ONE SUPREME COURT CASE
23   I THINK WE CITED IN OUR BRIEF CALLED COMMUNITY FOR CREATIVE
24   NON-VIOLENCE VS. REED (PHONETIC).  THAT DEALS WITH COPYRIGHT
25   BECAUSE THIS COMES UP IN COPYRIGHT BECAUSE OF THE PARTICULARITY
```

1    OF COPYRIGHT.  IT DEPENDS WHO OWNS IT BASED UPON INDEPENDENT

2    CONTRACTOR VERSUS EMPLOYMENT.  BUT THAT ALL IS TO SAY WE'RE

3    APPLYING SOME LAW THAT'S A LITTLE UNUSUAL BECAUSE NOW WE'RE

4    ASKING OURSELVES, WELL, WHAT DUTIES MIGHT BE INVOKED?  AND I DO

5    THINK THEY'RE DIFFERENT, WHETHER THEY'RE AN INDEPENDENT

6    CONTRACTOR VERSUS AN EMPLOYEE.  AND THEY CERTAINLY DO HINGE

7    UPON CONTROL, BUT CONTROL IS A SPECTRUM.  IF I HIRE A PLUMBER

8    AND ASK THE PLUMBER TO BE THERE, AND WE DECIDE HE'S GOING TO BE

9    THERE AT 2:00, AND HE'S GOING TO FIX MY TOILET, I AM GOING TO

10   HAVE A DEGREE OF CONTROL OVER HIM AT THAT TIME.

11        ONE OF THE CASES THE PLAINTIFF CITED IN HER BRIEF, IT WAS

12   CALLED -- IT'S CALLED STOLLARD FILMS VS. BERNECKER (PHONETIC).

13   THAT INVOLVED A STUNTMAN ON A MOVIE PRODUCTION.  AND THEY WERE

14   FIGHTING OVER INDEPENDENT CONTRACTOR VERSUS EMPLOYMENT STATUS.

15   OF COURSE, INTERESTINGLY ENOUGH, THESE CASES FREQUENTLY ARE THE

16   PROSPECTIVE EMPLOYEE (VERBATIM) WANTING TO GET OUT OF PAYING

17   BENEFITS OR WORKERS' COMP.  THAT'S WHAT THIS CASE IS ABOUT,

18   WHICH IS INTERESTING HERE BECAUSE NOW OUR EMPLOYER, RESPECTIVE

19   EMPLOYER, WANTS THE BENEFITS OF SOMETHING SHE NEVER ACTUALLY

20   PAID THE GOVERNMENT FOR, SO TO SPEAK, BECAUSE SHE NEVER

21   WITHHELD TAXES, SHE NEVER PAID PAYROLL TAXES, SHE NEVER PAID

22   WORKER'S COMP, OR SHE NEVER DID ANY OF THAT -- IF WE HAVE A

23   1099, WHICH IS UNDISPUTED.  SO IN THAT CASE WITH THE STUNTMAN

24   RIGHT, EVEN THEN YOU CAN SEE VERY, VERY DEEP CONTROL.  AND THE

25   COURT RULED HE WAS AN EMPLOYEE.  SO STUNTMAN, AS YOU CAN

1   IMAGINE, IS TO SHOW UP, USE ALL THE THINGS THE MOVIE PRODUCTION

2   GIVES THEM, ALL THE SAFETY EQUIPMENT, ALL THE PROPS, HAS TO BE

3   VERY EXACTING.  AND THE COURT GOES INTO GREAT DETAIL SAYING IN

4   FACT WE TELL THE STUNTMAN HOW HIS ARM'S GOING TO BE POSED, VERY

5   EXACT.  AND SO THERE'S A INCREDIBLE AMOUNT OF CONTROL, SO HE

6   MUST BE AN EMPLOYEE, AND, THEREFORE, HE'S ENTITLED TO WORKER'S

7   COMP, RIGHT.  WE DON'T HAVE THAT HERE.  WE CERTAINLY HAVE SOME

8   CONTROL.  YOU'RE ALWAYS GOING TO HAVE SOME CONTROL, JUST LIKE

9   ME AND THE PLUMBER I HIRED TO FIX MY TOILET.  BUT NOT THE LEVEL

10  OF CONTROL THAT MAKES THIS AN EMPLOYMENT CIRCUMSTANCE, RIGHT.

11  WHAT YOU HAVE IS INTERMITTENT CONDUCT.  YOU DON'T HAVE A TIME

12  AND PLACE SOMEBODY SHOWS UP TO.  YOU HAVE, I THINK, NO DISPUTE

13  THAT MY CLIENT KIND OF DID HER WORK AS SHE PLEASED, AND THAT

14  THINGS WERE SCHEDULED TO GO SORT OF AS THEY WERE.  GRANTED, I

15  THINK MAKES SINCE IN THIS CASE THAT MS. CATHELL WOULD SAY, I'D

16  LIKE YOU TO POST THIS SOMETIME THIS DAY, RIGHT.  THESE ARE ALL

17  NATURAL INCLINATIONS OF THE WORK WE'RE TALKING ABOUT HERE, BUT

18  THEY DON'T RESULT IN EMPLOYMENT.  AND AT A MINIMUM FOR THIS

19  HEARING THEY DON'T SHOW THE -- MEET THE HEAVY BURDEN OF A

20  LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE THERE'S OBVIOUSLY

21  SIGNIFICANT DOUBT.  AND HONESTLY THERE'S MORE STUFF I MIGHT

22  EVEN LIKE TO KNOW IN DISCOVERY, FRANKLY.  BUT AT THE OUTSET I

23  THINK MAYBE THE BIGGEST GUIDING LIKE HERE WOULD BE, THE

24  PLAINTIFF SHOULDN'T BE ABLE TO HAVE HER CAKE AND EAT IT, TOO.

25  SHE DIDN'T PAY FOR ANY OF THE BENEFITS SHE'D NORMALLY PAY, ALL

```
1    THE BURDENS YOU WOULD HAVE GO -- HAVE ON THE -- WITH THE
2    GOVERNMENT ON TAXES AND WORKERS' COMP AND UNEMPLOYMENT.  BUT
3    NOW WHEN SHE WANTS A DUTY, RIGHT, WHEN THE PLAINTIFF WANTS A
4    DUTY THAT WOULD ARISE IN EMPLOYMENT, WE SAY IT'S EMPLOYMENT,
5    THAT THERE'S A HEAVY BURDEN OF -- TO COME OVER THAT, AND THEN
6    YOU COMBINE THE FACT THAT THERE'S NOTHING IN WRITING BETWEEN
7    THE TWO EVEN SAYING, SETTING OUT ANY OF THE TERMS WE'RE TALKING
8    ABOUT, AT BEST WE'RE TALKING ABOUT SOME COURSE OF DEALING, AND
9    THAT'S QUITE SPECULATIVE AT THIS STAGE I'D SAY.
10        SO, YOUR HONOR, I THINK THAT LEAVES US WITH -- YOU'VE
11   ALLUDED TO THESE VARIOUS STATE LAW CLAIMS.  YOU KNOW, I
12   HESITATE TO SIT AND REFUTE EVERY ONE.  I THINK THEY'RE ALL
13   VARIOUSLY TIED TO EITHER THE FEDERAL CLAIMS TRADE SECRET --
14   TRADE SECRET -- OR, EXCUSE ME -- TRADEDRESS MISAPPROPRIATION.
15   YOU KNOW, MOREOVER, WE DO -- I KNOW IT'S NOT SET BEFORE THE
16   COURT TODAY, SO I'M NOT ATTEMPTING TO ARGUE EXCEPT THAT WE DO
17   HAVE A MOTION TO DISMISS.  CERTAINLY, RIGHT, IF YOU RULED
18   POSITIVELY FOR OUR SIDE ON THE MOTION TO DISMISS, THEN THE
19   COURT SHOULDN'T BE ISSUING AN INJUNCTION ON ANY OF THE STATE
20   ISSUES.  AND THERE'S A SIGNIFICANT ISSUE BECAUSE PERHAPS THE
21   COURT DOESN'T WANT TO EXERCISE SUPPLEMENTAL JURISDICTION IF YOU
22   CONCLUDE THAT THOSE TWO FEDERAL CLAIMS ARE NOT SUFFICIENTLY
23   PLED.  AND SO I ENCOURAGE THE COURT, THEN, ON THOSE STATE
24   ISSUES TO CONSIDER THAT AND ALSO TO CONSIDER THE FACT THAT
25   EVERY SINGLE ONE OF THOSE, THE DAMAGES ARE TIED TO ONE OF THE
```

1   FEDERAL CLAIMS, RIGHT.  SO, FOR EXAMPLE, CONVERSION.  AND

2   CONVERSION'S A GOOD EXAMPLE BECAUSE YOU CAN'T CONVERT

3   INTANGIBLE PROPERTIES.  THE ALLEGATION'S BASICALLY YOU STOLE

4   THE TRADE SECRETS.  WELL, THAT'S INTANGIBLE.  AND EVEN BY THEIR

5   OWN ACCOUNT, NOTHING'S IN WRITING, SO IT'S NOT LIKE THEY'RE

6   ALLEGING MY CLIENT TOOK A DIGITAL FILE OR SOMETHING IN WRITING

7   BECAUSE THEIR COMPLAINT SAYS THERE'S NOTHING IN WRITING ABOUT

8   ANY OF THESE TRADE SECRETS.  ON THE MERITS, THAT'S NOT A

9   CONVERSION CLAIM.  IT HAS TO BE CHATTEL PROPERTY.  BUT

10  MOREOVER, RIGHT, WHAT ARE THE DAMAGES, YOU TOOK A TRADE SECRET.

11  WELL, IF THE COURT CONCLUDES THAT WE DON'T HAVE A SUFFICIENTLY

12  BOUNDED TRADE SECRET PLED, THEN THAT CLAIM GOES AWAY ANYWAY.

13  AND THAT'S TRUE OF ALL OF THOSE CLAIMS AS WAS CITED IN OUR

14  BRIEF.  SO, YOU KNOW, I WOULD URGE THE COURT, ESPECIALLY, I

15  THINK, TO THE PUBLIC HARM, THE HARM THAT WOULD BE CAUSED TO MY

16  CLIENT, WHICH I THINK GREATLY OUTWEIGHS POTENTIAL MONEY RELIEF

17  AS TO THE THIRD ELEMENT OF INJUNCTIVE RELIEF, AND EVEN AS TO

18  IRREPARABLE HARM, I'M JUST NOT SEEING IT.  SO I'D ENCOURAGE THE

19  COURT TO DENY THE MOTION FOR PRELIMINARY INJUNCTION.  THANK

20  YOU, YOUR HONOR.

21          THE COURT:  THANK YOU.

22      NOW, LET ME TALK TO YOU -- THERE'S A LOT OF DIFFERENT

23  THINGS TO TALK ABOUT, AND SO LET ME JUST START OFF WITH THE

24  T.R.O., BUT THAT'S WHAT WE'RE HERE TO TALK ABOUT TODAY, IS

25  WHETHER OR NOT THE T.R.O. SHOULD BE GRANTED.  AND AS IT'S BEEN

1  SAID, THIS IS WHAT'S CALLED EXTRAORDINARY RELIEF.  AND IT'S A

2  HIGH BURDEN FOR THE PLAINTIFF.  THE PLAINTIFF HAS TO COME IN

3  AND ESTABLISH ALL OF THESE FACTS.  AND BASICALLY IT'S KIND OF

4  THE COURT INITIALLY DECIDING THAT THE PLAINTIFF IS GOING TO WIN

5  AND PRESERVING THE STATUS QUO.  SO IT'S A DIFFICULT REMEDY TO

6  GET AND IT'S A HIGH BURDEN, WHICH IS DIFFERENT THAN THE BURDEN

7  THAT COMES ALONG LATER IN THE CASE.  AND ONE OF THE FACTORS THE

8  COURT LOOKS AT FIRST IS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON

9  THE MERITS.  AND IT'S JUST NOT A LIKELIHOOD.  IT'S A

10  SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.  AND THERE ARE

11  14 COUNTS IN THIS CASE.  SOME OF THEM ARE BETTER THAN OTHERS.

12  SOME OF THEM ARE ACTUALLY, I THINK, ALMOST FRIVOLOUS, BUT SOME

13  OF THEM ARE POTENTIALLY WITH MERIT.  THE TWO CATEGORY -- WELL,

14  I GUESS THE THREE CATEGORIES THAT ARE KIND OF THE MORE

15  CONCRETELY BRIEFED AND DISCUSSED ARE THE EMPLOYMENT-RELATED

16  CLAIMS, THE TRADE SECRET CLAIMS, AND THE TRADEDRESS CLAIMS.

17      IN LOOKING AT THE EMPLOYEE CLAIMS, THERE JUST SEEMS TO ME

18  A LOT OF QUESTIONS OF FACT ON THIS ISSUE.  AND WHAT THAT MEANS

19  IS THAT I HAVE NOT SEEN THAT IT'S BEEN PROVEN AT THIS STAGE

20  BEFORE DISCOVERY, THAT THE DEFENDANT WAS AN EMPLOYEE WHO HAD

21  THESE DIFFERENT EMPLOYEE-RELATED OBLIGATIONS.  I DON'T KNOW

22  WHAT ULTIMATELY THE ANSWER IS, BUT IT LOOKS LIKE THERE ARE

23  FACTS ON BOTH SIDES.  AND IT LOOKS LIKE IT'S GOING TO BE A

24  QUESTION THAT MAY ULTIMATELY BE RESOLVED BY A JURY OR THAT

25  WE'VE GOT TO GET THE FACTS MORE CONCRETELY ESTABLISHED.  SO FOR

```
1   THOSE CLAIMS I DO NOT FIND THAT THERE WAS A SUBSTANTIAL
2   LIKELIHOOD OF SUCCESS ON THE MERITS.
3       IN TERMS OF THE TRADE SECRET RELATED CLAIMS, I'M STILL
4   HAVING TROUBLE WITH THE DEFINITION OF WHAT THESE TRADE SECRETS
5   ACTUALLY ARE.  AND IF I WERE TO GRANT AN INJUNCTION AND I HAVE
6   TO SAY WHAT THE TRADE SECRETS ARE, I'M STILL HAVING A
7   DIFFICULTY IN KIND OF PULLING OUT THE SECRET PART FROM THE
8   PUBLIC PART.  THERE ALSO SEEMS TO BE SOME PRETTY BIG QUESTIONS
9   AS TO WHETHER THESE TRADE SECRETS WERE APPROPRIATELY PROTECTED,
10  AND, AGAIN, WHETHER THIRD PARTIES SUCH AS LIKE TO KNOW HAD
11  ACCESS TO THIS INFORMATION.  SO THAT IS A DIFFICULT PART AS
12  WELL.  AND I ALSO DON'T FIND THAT IT'S BEEN ESTABLISHED THAT
13  THE DEFENDANT IS -- HAS MISAPPROPRIATED THE TRADE SECRETS AND
14  IS ACTUALLY USING THE TRADE SECRETS.  I THINK THAT THERE
15  CERTAINLY IS EVIDENCE THAT IF THERE ARE TRADE SECRETS, SHE'S
16  LIKELY USING THEM.  BUT IT'S, AGAIN, ALL THE PLAINTIFF HAS IS
17  THIS ARGUMENT THAT SHE HAD ACCESS TO TRADE SECRETS AND HER SITE
18  PUBLICLY LOOKS LIKE THE SITE -- WHICH I THINK IS TRUE.  IT DOES
19  LOOK LIKE IT -- THAT THESE SITES LOOK ALIKE, SO, THEREFORE, SHE
20  MUST BE USING THE TRADE SECRETS.  BUT THAT'S SOMETHING THAT HAS
21  TO BE ESTABLISHED, AND I DON'T FIND THAT THESE FACTORS HAVE
22  BEEN MET.
23      THE TRADEDRESS ISSUE TO ME IS COMPLICATED.  AND I THINK
24  THAT THERE ISN'T A LOT OF LAW THAT I'VE SEEN THAT DEALS WITH
25  THIS SPACE AND LOOKING AT KIND OF WHAT CAN BE TRADEDRESS IN
```

1    DEALING WITH THESE KIND OF BLOGS AND INSTAGRAM SITES AND THINGS

2    OF THAT NATURE, AND WHAT IS FUNCTIONALITY VERSUS WHAT IS

3    NON-FUNCTIONAL THAT GETS A MORE DEGREE OF PROTECTION.  AND I'M

4    ALSO CONCERNED WITH WHAT THE DEFENDANT STATED, WHICH IS THIS

5    IDEA THAT IF I FIND THAT THERE IS A SUBSTANTIAL LIKELIHOOD OF

6    SUCCESS ON THE MERITS, THAT THIS PROTECTED TRADEDRESS THAT THE

7    DEFENDANT HAS COPIED, THEN WHAT DOES IT DO TO THIS COPYCAT

8    ISSUE AND THE FACT THAT SOMEBODY CANNOT USE CONFIDENTIAL

9    INFORMATION AND THAT IT WOULD BE A REALLY BROAD FINDING HERE.

10   AND WHO WAS FIRST, WHO IS SECOND.  IT'S CERTAINLY EASY TO

11   DETERMINE HERE, BUT NOT ACROSS THE INTERNET.  I'M NOT SAYING

12   THAT THERE ISN'T POTENTIALLY A TRADEDRESS CLAIM.  IT'S JUST

13   THAT IT'S NOT A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE

14   MERITS.  AND THIS IS SOMETHING THAT'S GOING TO HAVE TO BE

15   BRIEFED IN MORE DETAIL AND KIND OF DEALT WITH.  AND CERTAINLY

16   IT MAY BE THAT THE PLAINTIFF PREVAILS ON THIS, BUT I DON'T SEE

17   THAT IT'S CLEAR ENOUGH TO WARRANT AN INJUNCTION.

18        NOW, THE IRREPARABLE INJURY PROBLEM IS ALSO ONE THAT I

19   HAVE SOME STRONG CONCERNS ABOUT, AND I DON'T FIND THAT THE

20   PLAINTIFF HAS MET THE BURDEN ON THAT PIECE BECAUSE IT'S NOT

21   CLEAR THAT JUST BECAUSE THE DEFENDANT IS SUCCESSFUL, THAT THAT

22   HAS MEANT THAT THE PLAINTIFF IS LESS SUCCESSFUL.  I DON'T KNOW

23   THAT WE CAN SAY THAT.  IT'S ALSO UNCLEAR ULTIMATELY WHAT THE

24   DAMAGES ARE HERE FROM THESE INDIVIDUAL CLAIMS AND HOW THIS IS

25   GOING TO BE CALCULATED.  SO IT'S NOT CLEAR TO ME THAT THE

1   PLAINTIFF HAS SHOWN THAT SHE IS LOSING CUSTOMERS BECAUSE OF
2   DEFENDANT'S USE OF CONFIDENTIAL INFORMATION VERSUS HER USE OF
3   JUST THIS KIND OF PUBLICLY AVAILABLE INFORMATION, AND THAT
4   PEOPLE HAVE STOPPED GOING TO THE PLAINTIFF'S SITE OR STOPPED
5   BUYING FROM THE PLAINTIFF BECAUSE THE DEFENDANT'S SITE IS USING
6   THIS CONFIDENTIAL INFORMATION OR THIS COPY TRADEDRESS
7   INAPPROPRIATELY -- OR TYING THIS BACK TO THAT.  I JUST DON'T
8   THINK THAT THAT HAS BEEN DEMONSTRATED.
9       THE BALANCE OF THE HARMS IS TIED A LITTLE BIT TO THE OTHER
10  FACTORS.  I THINK THAT YOU'VE GOT THE FACT THAT CERTAINLY THE
11  INJUNCTION THAT THE PLAINTIFF IS ASKING FOR WOULD CAUSE GREAT
12  HARM TO THE DEFENDANT.  THERE ARE WAYS TO MAYBE HAVE A
13  DIFFERENT KIND OF LESSER INJUNCTION THAT MIGHT BE LESS HARMFUL,
14  BUT CERTAINLY I THINK THERE WOULD BE A LOT OF HARM TO THE
15  DEFENDANT.  AND THE PLAINTIFF'S ARGUMENT ON THE BALANCE OF
16  HARMS IS THAT THIS IS NOT JUST ANOTHER COMPETITOR.  THIS IS A
17  COMPETITOR THAT'S USING TRADE SECRETS, THE CONFIDENTIAL
18  INFORMATION, BUT THAT IS STILL A QUESTION.
19      THE HARM TO THE PUBLIC, THAT KIND OF GOES BOTH WAYS EXCEPT
20  AS IT RELATES TO, I THINK, THIS IDEA OF THESE MORE GENERIC
21  COPYCAT WEBSITES AND HOW THIS MIGHT IMPACT THEM.  BUT OVERALL I
22  DO THINK THAT THE PLAINTIFF HASN'T MET THEIR BURDEN TO GET AN
23  INJUNCTION, SO I'M NOT GOING TO GRANT THE INJUNCTION.  BUT LET
24  ME ALSO SPEAK TO SOME OTHER ISSUES.  NOT GRANTING AN INJUNCTION
25  IS NOT AT ALL THE SAME THING AS SAYING THAT I THINK THAT THE

```
 1   PLAINTIFFS HAVE A BAD CASE AND THAT THE CASE IS GOING TO BE

 2   DISMISSED.  THE OTHER THING THAT I WILL SAY IS THAT IF A JURY

 3   LOOKS AT THIS, THEY'RE GOING TO SEE SOME, FOR LACK OF A BETTER

 4   WORD, KIND OF SKETCHY BEHAVIOR AND MAYBE A BETRAYAL OF TRUST.

 5   AND JURIES DON'T LIKE THAT.  I DON'T KNOW WHICH OF THESE 14

 6   CLAIMS IS GOING TO MAKE IT ALL THE WAY THROUGH, IF ANY.  THAT'S

 7   A QUESTION THAT'S LEFT FOR ANOTHER DAY, BUT A JURY'S NOT GOING

 8   TO LIKE YOU SENDING THESE TEXTS TO THE PLAINTIFF THE WHOLE TIME

 9   YOU WERE OPERATING A SECRET BUSINESS THAT LOOKS A WHOLE LOT

10   LIKE HERS.  SO MAYBE THERE'S NOT TECHNICALLY TRADEDRESS

11   VIOLATIONS OR TECHNICALLY THEFT OF TRADE SECRETS.  I DON'T KNOW

12   IF THERE IS OR ISN'T, BUT IF ONE OF THESE CLAIMS MAKES IT

13   THROUGH, THEY'RE NOT GOING TO LIKE THIS.  THIS IS NOT A GOOD

14   LOOK FOR YOU.  AND SO FINDING THAT THE PLAINTIFF HASN'T MET

15   THIS EXTRAORDINARY BURDEN IS NOT SAYING THAT THE COURT BELIEVES

16   THE PLAINTIFF DOES NOT HAVE A CASE.  THAT'S A WHOLE DIFFERENT

17   CALCULATION FOR ANOTHER DAY.  I THINK IT'S IMPORTANT THAT

18   YOU'RE BOTH HERE AND YOU'RE HEARING HOW THIS IS COMING OUT

19   BECAUSE I THINK PEOPLE GET VERY PERSONALLY INVOLVED IN CASES

20   AND IT CAUSES THEM SOMETIMES TO NOT LOOK AT THE TECHNICAL

21   BURDENS AND WHAT THE LAW REQUIRES TO PROVE AND HOW THIS IS

22   GOING TO BE PROVED AND HOW DAMAGES ARE GOING TO BE MEASURED.

23   AND EVEN THOUGH I'M NOT SHUTTING DOWN YOUR SITE, IT'S POSSIBLE

24   THAT YOU HAVE TO GIVE BACK ALL THE MONEY THAT YOU EARNED FROM

25   YOUR SITE.  SO DEALING WITH THIS SOONER THAN LATER, IT'S GOING
```

```
 1   TO BE, I THINK, VERY IMPORTANT FOR BOTH OF YOU.  THE LEGAL FEES
 2   THAT Y'ALL ARE PAYING TO DEAL WITH THIS ARE PROBABLY PRETTY
 3   HIGH GIVEN THE NUMBER OF PEOPLE I SEE HERE.  AND SO WHAT I'M
 4   GOING TO DO IS I'M GOING TO ENTER AN ORDER DOING THIS.  I AM
 5   GOING TO ORDER YOU TO MEDIATION.  I THINK Y'ALL NEED TO THINK
 6   ABOUT WHAT A RESOLUTION OF THIS LOOKS LIKE.  I DON'T THINK
 7   ANYONE IS NECESSARILY GOING TO GET EVERYTHING THEY WANT IN TWO
 8   YEARS DOWN THE ROAD, WHICH IS PROBABLY WHAT THIS IS GOING TO
 9   TAKE, IN EXPERTS AND DEPOSING PEOPLE AT INSTAGRAM POTENTIALLY.
10   THIS IS GOING TO CREATE ITS OWN SET OF ISSUES.  Y'ALL ARE GOING
11   TO HAVE THIS HANGING OVER YOU FOR A LONG PERIOD OF TIME.  I CAN
12   GUARANTEE THAT BOTH OF YOU ARE VERY STRESSED OUT ABOUT THIS AND
13   THIS IS CAUSING A LOT OF DRAMA IN YOUR LIVES.  AND SO YOU ARE
14   GOING TO BE MUCH BETTER OFF IF YOU CAN COME UP WITH A WAY TO
15   RESOLVE THIS AND THINK ABOUT WHAT THAT MIGHT LOOK LIKE.  AND SO
16   YOU'RE NOT REQUIRED TO SETTLE THE CASE.  THERE'S NO REQUIREMENT
17   EVER THAT SOMEONE SETTLE A CASE.  I CAN'T MAKE YOU DO THAT, BUT
18   I THINK THAT THIS KIND OF SCORCHED-EARTH APPROACH IS NOT GOING
19   TO BE HELPFUL FOR ANYBODY LONG TERM.  AND SO THERE ARE WAYS TO
20   CRAFT RESOLUTIONS.  THERE ARE WAYS TO KIND OF MAYBE CHANGE IN
21   SOME WAY THE SITE.  THERE COULD BE WAYS THAT OVER A PERIOD OF
22   TIME A CERTAIN COMMISSION IS PAID TO THE PLAINTIFF UNTIL IT'S
23   AGREED UPON.  THERE ARE LOFTS WAYS TO RESOLVE THIS.  AND IF YOU
24   GO ALL THE WAY TO A JURY, JURIES ARE VERY BLUNT-FORCED TOOLS.
25   AND SO MAYBE THEY DO AWARD A LOT OF THE DAMAGES TO PLAINTIFF,
```

```
 1   BUT COULD THE DEFENDANT EVEN PAY THEM?  YOU'RE LOOKING AT
 2   SCENARIOS WHERE PEOPLE MAY NOT GET WHAT THEY WANT AND WILL HAVE
 3   TO GO THROUGH THIS FOR A COUPLE OF YEARS AND PAY A LOT OF
 4   ATTORNEY'S FEES.  AND SO I THINK THAT EVERYONE KIND OF NEEDS TO
 5   STEP BACK AND THINK ABOUT WHAT THEY WANT TO ACCOMPLISH.  AND SO
 6   I AM GOING TO ORDER THE CASE TO MEDIATION.  IF IT DOESN'T
 7   RESOLVE, THEN WE'LL PICK BACK UP IN DISCOVERY, AND I'LL RULE ON
 8   THE MOTION TO DISMISS.  I DO WANT THE MEDIATION TO HAPPEN
 9   BEFORE THE MOTION TO DISMISS IS RULED ON, AND RELATIVELY SOON.
10   JUST MY GUT IS THAT PROBABLY SOME OF THESE CLAIMS ARE GOING
11   AWAY, BUT NOT ALL OF THEM.  AND SO THERE ARE SOME THAT SEEM TO
12   BE KIND OF, LIKE, CLAIM NUMBER 13 OR 12 SEEMS TO BE MAYBE A
13   REACH, BUT THERE ARE CLAIMS IN THERE THAT LOOK LIKE THERE MIGHT
14   BE SERIOUS QUESTIONS OF FACT THAT WOULD TAKE IT TO THE NEXT
15   LEVEL.  AND SO SOME OF THE PROBLEMS THAT CONCERN ME AT A T.R.O.
16   MAY NOT BE AS OF AS MUCH CONCERN FOR A MOTION TO DISMISS.  SO
17   THAT'S WHAT I'M GOING TO DO.  I'M NOT GOING TO ENTER A SEPARATE
18   ORDER ON THE T.R.O.  THE TRANSCRIPT HAS ALL MY FINDINGS ON THAT
19   SO THAT YOU CAN HAVE ACCESS TO THAT.  AND SO I DO APPRECIATE
20   YOU ANSWERING MY QUESTIONS.  I HAVE A LOT OF QUESTIONS.  I
21   THINK THAT IT'S IMPORTANT TO REMEMBER THAT I COME IN AFTER
22   READING EVERYTHING AND TRYING TO FIGURE OUT WHAT DECISION I'M
23   GOING TO MAKE AND WHAT ISSUES ARE THE HARDEST FOR YOU.  AND SO
24   WHAT I WANT TO ASK YOU ABOUT ARE THE THINGS THAT I THINK ARE
25   GOING TO CAUSE YOU THE MOST PROBLEM SO THAT YOU CAN ADDRESS
```

```
1   THEM.  SOME OF THE ISSUES I DIDN'T ASK YOU ABOUT AS MUCH ARE

2   BECAUSE I FELT THAT YOU HAD A GOOD ARGUMENT ON THAT OR I

3   UNDERSTOOD YOUR ARGUMENT ON THAT.  SO EVEN THOUGH NOT EVERYONE

4   GOT TO ALL OF THEIR ARGUMENT, I DID SPEND A LOT OF TIME ON THE

5   BRIEFS AND ACTUALLY READ THEM MORE THAN ONCE.  SO I'M VERY

6   FAMILIAR WITH KIND OF THIS WHOLE PACKET OF STUFF THAT WAS

7   SUBMITTED.  SO, WITH THAT, WE ARE ADJOURNED.  THANK YOU.

8              (PROCEEDINGS ADJOURNED.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT

C E R T I F I C A T E


UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA

    I, MONTRELL VANN, RPR, RMR, RDR, CRR, OFFICIAL COURT

REPORTER FOR THE UNITED STATES DISTRICT COURT, FOR THE NORTHERN

DISTRICT OF GEORGIA, DO HEREBY CERTIFY THAT THE FOREGOING

50 PAGES CONSTITUTE A TRUE TRANSCRIPT OF PROCEEDINGS HAD BEFORE

THE SAID COURT, HELD IN THE CITY OF ATLANTA, GEORGIA, IN THE

MATTER THEREIN STATED.

    IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS, THE

16TH DAY OF FEBRUARY 2023.


                        /S/ MONTRELL VANN
                        MONTRELL VANN, RPR, RMR, RDR, CRR
                        OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT